## UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF ILLINOIS EASTERN DIVISION

|  |  |
|---|---|
| JACOB M. SCHEINER IRA, individually and on behalf of all others similarly situated,<br><br>Plaintiff,<br><br>v.<br><br>MIDAS, INC., TBC CORPORATION, GEARSHIFT MERGER CORP., J.P. MORGAN SECURITIES LLC, ALAN D. FELDMAN, ROBERT R. SCHOEBERL, THOMAS L. BINDLEY, ARCHIE R. DYKES, JAROBIN GILBERT JR., and DIANE L. ROUTSON,<br><br>Defendants. | Case No. 1:12-cv-2653 |

### CLASS ACTION COMPLAINT

Plaintiff Jacob M. Scheiner IRA ("Plaintiff"), after an examination and inquiry conducted by and through its attorneys, alleges the following for its Complaint:

### NATURE AND SUMMARY OF THE ACTION

1.    Plaintiff brings this class action on behalf of the public shareholders of Midas, Inc. ("Midas" or the "Company") against Midas and the Midas Board of Directors (the "Board"), TBC Corporation ("TBC" or "Parent"), Gearshift Merger Corp. ("Gearshift" or "Acquisition Sub"), and J.P. Morgan Securities LLC ("J.P. Morgan") seeking relief for their breaches of fiduciary duty and other violations of state law arising out of their attempt to sell the Company to TBC and its related entities. Plaintiff, individually, brings a claim against Midas and the Individual Defendants, as defined herein, for their violations of Section 14(d) and Section 14(e) of the Securities Exchange Act of 1934 (the "Exchange Act") 15U.S.C. §§ 78n(d) – (e) and the

rules and regulations of the Securities and Exchange Commission ("SEC") promulgated thereunder.

2.     On March 13, 2012, Midas and TBC issued a joint press release announcing that they had entered into a material definitive Agreement and Plan of Merger (the "Merger Agreement") pursuant to which TBC will acquire Midas through a cash tender offer of $11.50 per share (the "Proposed Transaction"). The all-cash transaction is valued at approximately $310 million, including the assumption of approximately $137 million in debt and pension liabilities. The press release further stated that the Merger Agreement provides for termination fees payable by Midas and a provision under which Midas agreed not to solicit any competing offers.

3.     Pursuant to the terms of the Merger Agreement, TBC will commence a tender offer (the "Tender Offer") to acquire all of Midas' outstanding shares of common stock (together with the associated preferred stock purchase rights, the "Common Stock") for $11.50 in cash per Midas share ("Per Share Consideration"). The Merger Agreement provides that the Offer will expire 20 business days following the commencement of the Tender Offer, subject to certain extension rights and obligations set forth in the Merger Agreement, provided that Gearshift Merger Corp. ("Gearshift" or "Acquisition Sub") shall not be required to extend the expiration date of the Tender Offer beyond July 12, 2012. Following the Tender Offer, if TBC owns more than 90% of Midas' outstanding common stock, including shares acquired following the exercise of a top-up option, if necessary, TBC will complete the Proposed Transaction in a short form second-step merger without any shareholder vote.

4.     Plaintiff alleges that the Individual Defendants have breached their fiduciary duties to it and the other Midas common shareholders by offering a price far below the intrinsic value of Midas' shares that does not fully take into account the Company's recent financial

2

performance and prospects for continued growth, and seeks to enjoin the consummation of the unfair Proposed Transaction.

5.       Moreover, as described below, the Proposed Transaction is fundamentally unfair to Plaintiff and other public shareholders of the Company both with respect to process as well as price. The Proposed Transaction is the result of a tainted sale process that: (1) favored TBC from the initiation of the process; and (2) was guided by the Company's biased financial advisor J.P. Morgan, who had and has serious conflicts of interest with respect to its enormous financial stake in TBC's parent company Sumitomo Corporation ("Sumitomo") that rendered it unable to objectively advise Midas through the sale process and unable to render a reliable fairness opinion.       The Individual Defendants' failure to maximize shareholder value, protect its shareholders by performing appropriate conflict checks as to J.P. Morgan and its financial entanglements with TBC and Sumitomo, and engage an independent and unconflicted financial advisor to opine on the fairness of the Proposed Transaction to Midas' shareholders, constitutes a breach of their fiduciary duties owed to Midas' shareholders and a violation of applicable legal standards governing their conduct.

6.       The Board compounded its breaches of fiduciary duty by acceding to TBC's demands and locking up the deal to ensure that no other potential bidders would emerge to top TBC's offer with onerous deal protection devices that effectively eliminate any potential competing suitors for the Company, including:    (i) an irrevocable Top-up Option which circumvents the requirement of a shareholder vote if TBC does not obtain the minimum number of shares necessary to effectuate the short form merger, permitting TBC to purchase the number of shares necessary to reach the short-form merger threshold; (ii) a "matching-rights" provision allowing TBC the right to match or top any superior proposal made by a competing acquirer; and

3

(iii) imposition of termination fees of $6.88 million on Midas payable to TBC in certain circumstances, including if Midas terminates the Merger Agreement in order to pursue an alternative superior proposal.

7.     The members of Midas' Board will also benefit personally if the Proposed Transaction closes. Midas' Chairman, President, and CEO, Alan D. Feldman ("Feldman"), will realize a potential payout of approximately $12.5 million upon the consummation of the Proposed Transaction. The remaining Board members will each receive benefits ranging from $42,000 to $264,000 from cashing out their stock holdings.

8.     In an attempt to secure shareholder support for the unfair Proposed Transaction, on March 28, 2012, TBC filed its Tender Offer Statement on Schedule TO ("Schedule TO") with the SEC commencing the Tender Offer.

9.     On the same day, Midas caused to be filed with the SEC its Recommendation Statement in connection with the Tender Offer on Schedule 14D-9 ("14D-9") that outlines the Proposed Transaction, and recommends that the public shareholders of Midas tender their shares in the offer, in breach of the Individual Defendants' fiduciary duties to the Company's shareholders both with respect to price and process. As alleged herein, the 14D-9 is materially false and misleading in that it fails to disclose to Plaintiff material information regarding the Proposed Transaction, stripping Plaintiff of its ability to render an informed decision as to whether to tender its shares in favor of the Proposed Transaction.

10.     In light of the Board's breaches of fiduciary duty in agreeing to the Proposed Transaction, the aiding and abetting of such breaches by the Defendants, and failure to fully disclose all material information to Midas shareholders, Plaintiff seeks to enjoin Defendants

from completing the Proposed Transaction or, in the event the Proposed Transaction is indeed consummated, to recover damages resulting from the Defendants' wrongful conduct.

## JURISDICTION AND VENUE

11.     This Court has jurisdiction over the subject matter of this action pursuant to Section 27 of the Exchange Act, 15 U.S.C. § 78aa and 28 U.S.C. § 1331 (federal question), as well as 28 U.S.C. § 1367(a) (supplemental jurisdiction).

12.     In addition, this Court has jurisdiction of this action pursuant to 28 U.S.C. § 1332(d)(2). This is a class action on behalf of all current Midas shareholders (except for the Individual Defendants and their affiliates). At least one member of the class is a citizen of a state different from any defendant and the amount in controversy exceeds $5,000,000, exclusive of interest and costs. This action is not a collusive action designed to confer jurisdiction on a court of the United States that it would not otherwise have.

13.     This Court has jurisdiction over each defendant named herein. Each defendant is either a corporation that conducts business, and maintains operations in this District, or is an individual who has sufficient minimum contacts with this District and State to render the exercise of jurisdiction by this Court permissible under traditional notions of fair play and substantial justice.

14.     Venue is proper in this District pursuant to 28 U.S.C. § 1391(a) because: Defendant Midas has its principal place of business in this District; (b) one or more of the Defendants resides in this District; (c) Plaintiff's claims arose in this District, where most of the actionable conduct took place, where most of the documents are electronically stored and where the evidence exists and where virtually all the witnesses are located and available to testify at the jury trial permitted on these claims in this Court; and (d) Defendants have received substantial

compensation in this District by doing business here and engaging in numerous activities that had an effect in this District.

## THE PARTIES

15.     Plaintiff Jacob M. Scheiner IRA is, and was at all times relevant hereto has been, the owner of Midas common stock. Jacob M. Scheiner is a citizen of New York.

16.     Defendant Midas is a corporation duly organized and existing under the laws of the State of Delaware. Midas is one of the world's largest providers of automotive services, offering brake, maintenance, tires, exhaust, steering and suspension services at more than 2,250 franchised, licensed and company-owned Midas shops in 14 countries, including nearly 1,500 in the United States and Canada. Midas also owns the SpeeDee Oil Change and Tune-Up business ("SpeeDee"), with 161 auto service centers in the United States and Mexico. The Company maintains its principal offices at 1300 Arlington Heights Road, Itasca, Illinois. Midas common stock is traded on the NYSE under the symbol "MDS."

17.     Defendant TBC, a Delaware corporation with principal executive offices in Palm Beach Gardens, Florida, is owned by Sumitomo Corporation of America ("SCOA"), the largest subsidiary of Sumitomo, one of Japan's major integrated trading and investment business enterprises. TBC is one of the nation's largest marketers of automotive replacement tires through a multi-channel strategy. TBC is a wholesale supplier to independent regional tire retailers and distributors throughout the U.S., Canada, and Mexico. Additionally, TBC's wholesale group operates Carrol Tire, a regional tire wholesale distributor servicing independent tire dealers across the United States. TBC's Retail Group operates more than 1200 franchised and company-owned tire and automotive service centers under the brands Tire Kingdom, Merchant's Tire & Auto Centers, NTB-National Tire & Battery and Big O Tires.

18.     Defendant Gearshift is a Delaware corporation and a wholly-owned subsidiary of TBC. It was created for the purpose of facilitating the Proposed Transaction.

19.     Defendant J.P. Morgan is a financial investment advisory firm headquartered in New York and an affiliate of JP Morgan Chase Bank, N.A.  J.P. Morgan served as financial advisor to the Special Committee of Midas' Board in connection with the Proposed Transaction. According to the 14D-9, J.P. Morgan is involved in a share collar transaction, by one of its affiliates on behalf of a customer, with respect to 6.354% of Sumitomo's common stock, (worth approximately $1.1. billion based upon Sumitomo's current market capitalization), and has a .646% ownership interest in Sumitomo (worth approximately $115 million based upon Sumitomo's current market capitalization) ("Share Collar Transaction").

20.     All references herein to Defendant TBC include Defendant Gearshift.

21.     Defendant Feldman has served as a director of Midas since January, 2003 and is currently the Chairman, President and Chief Executive Officer ("CEO") of Midas.  Feldman is a member of the Company's Audit and Finance Committee, Compensation Committee and Nominating and Corporate Governance Committee.  As of March 20, 2012, he was the beneficial owner of 1,271,505 shares of Midas common stock representing approximately 8.39% of the shares outstanding, including 751,502 shares which he had the right to acquire prior to or on May 19, 2012 through the exercise of stock options.

22.     Defendant Robert R. Schoeberl ("Schoeberl") is the Company's Lead Director and has served as a Company director since 1998.  Schoeberl is a member of the Company's Audit and Finance Committee, Compensation Committee and Nominating and Corporate Governance Committee.  As of March 20, 2012, he was the beneficial owner of 41,714 shares of Midas common stock, including 15,267 shares which he had the right to acquire prior to or on

May 19, 2012 through the exercise of stock options. Schoeberl served as a director of Defendant TBC until January 12, 2012, when he resigned as a result of the potential conflict of interest of sitting on both the Company's and TBC's boards.

23.     Defendant Thomas L. Bindley ("Bindley") has served as a Company director since 1998. Bindley is a member of the Company's Audit and Finance Committee and Nominating and Corporate Governance Committee, and Chairperson of the Compensation Committee. Bindley also served on the Special Committee established by the Board on November 8, 2011 to recommend to the Board and the Company strategic alternatives ("Special Committee"). As of March 20, 2012, he was the beneficial owner of 27,915 shares of Midas common stock, including 6,000 shares which he had the right to acquire prior to or on May 19, 2012 through the exercise of stock options.

24.     Defendant Archie R. Dykes ("Dykes") has served as a Company director since 1998. Dykes is Chairperson of the Company's Nominating and Corporate Governance Committee and a member of the Audit and Finance Committee and Compensation Committee. Dykes also served on the Special Committee. As of March 20, 2012, he was the beneficial owner of 20,941 shares of Midas common stock, including 6,000 shares which he had the right to acquire prior to or on May 19, 2012 through the exercise of stock options.

25.     Defendant Jarobin Gilbert Jr. ("Gilbert Jr.") has served as a Company director since 1998. Gilbert Jr. is Chairperson of the Company's Audit and Finance Committee, and a member of the Compensation Committee and Nominating and Corporate Governance Committee. Gilbert Jr. also served on the Special Committee. As of March 20, 2012, he was the beneficial owner of 15,671 shares of Midas common stock, including 3,200 shares which he had the right to acquire prior to or on May 19, 2012 through the exercise of stock options.

26. Defendant Diane L. Routson ("Routson") has served as a Company director since 2003. Routson is a member of the Company's Audit and Finance Committee, Compensation Committee and Nominating and Corporate Governance Committee. Routson also served on the Special Committee. As of March 20, 2011, she was the beneficial owner of 14,000 shares of Midas common stock, including 2,000 shares which she had the right to acquire prior to or on May 19, 2012 through the exercise of stock options.

27. As a "Public Company" within the meaning of the federal securities laws, Midas is bound by the Exchange Act and its reporting requirements.

28. The Individual Defendants (named herein in paragraphs 21-26), as officers and/or directors of the Company, stand in a fiduciary relationship to Plaintiff and the Company's other public stockholders and owe them the highest fiduciary obligations of good faith, fair dealing, due care, loyalty, and full and candid disclosure. The Individual Defendants, together with Midas, TBC and J.P. Morgan, are collectively herein referred to as "Defendants."

29. Each of the Individual Defendants is liable as direct or indirect participants in the wrongs complained of. These defendants, because of their positions of control and authority as participants, officers and/or directors of the Company, were able to and did, directly or indirectly, control the actions of the Company in connection with the disclosure violations set forth herein, or participated in the preparation, approval and filing of Midas' materially misleading 14D-9 and its dissemination.

## THE FIDUCIARY DUTIES OF THE INDIVIDUAL DEFENDANTS

30. The Individual Defendants, as officers and/or directors of the Company, are in a fiduciary relationship with Plaintiff and the other public shareholders of Midas and owe them unwavering duties of good faith, fair dealing, undivided loyalty, and full and candid disclosure. As alleged herein, they have breached their fiduciary duties by, inter alia, failing to undertake a

fair sales process resulting in the failure to maximize shareholder value in the proposed sale of the Company.

31.     Under applicable law, in any situation where the directors of a publicly traded corporation undertake a transaction that will result in either: (i) a change in corporate control; or (ii) a breakup of the corporation's assets, the directors have an affirmative fiduciary obligation to obtain the highest value reasonably available for the corporation's shareholders, and if such transaction will result in a change of corporate control, the shareholders are entitled to receive a significant premium. To diligently comply with these duties, the directors and/or officers may not take any action that:

(a)     adversely affects the value provided to the corporation's shareholders;

(b)     will discourage or inhibit alternative offers to purchase control of the corporation or its assets;

(c)     contractually prohibits them from complying with and carrying out their fiduciary duties;

(d)     will otherwise adversely affect their duty to search and secure the best value reasonably available under the circumstances for the corporation's shareholders; or

(e)     will provide the directors and/or officers with preferential treatment at the expense of, or separate from, the public shareholders.

32.     In accordance with their duties of loyalty and good faith, the Individual Defendants, as directors and/or officers of Midas, are obligated under applicable law to refrain from:

(a)     participating in any transaction where the directors' or officers' loyalties are divided;

10

(b)     participating in any transaction where the directors or officers receive, or are entitled to receive, a personal financial benefit not equally shared by the public shareholders of the corporation; or

(c)     unjustly enriching themselves at the expense or to the detriment of the public shareholders.

33.     The Individual Defendants are also obliged to honor their duty of candor to Midas' shareholders by, *inter alia*, providing all material information to the shareholders regarding a scenario in which they are asked to vote or tender their shares. This duty of candor ensures that shareholders have all information that will enable them to make informed, rational, and intelligent decisions about whether to vote or tender their shares.

34.     Plaintiff alleges herein that the Individual Defendants, separately and together, in connection with the Proposed Transaction, are knowingly or recklessly violating their fiduciary duties, including their duties of loyalty, good faith, fair dealing, and candor owed to Plaintiff and other public shareholders of Midas.

## CONSPIRACY, AIDING AND ABETTING, AND CONCERTED ACTION

35.     In committing the wrongful acts alleged herein, Defendants have, collectively and individually, pursued, or joined in the pursuit of, a common course of conduct, and acted in concert with and conspired with one another, in furtherance of their common plan or design. In addition to the wrongful conduct herein alleged as giving rise to primary liability, Defendants further aided and abetted and/or assisted each other in breach of their respective duties as herein alleged.

36.     Each Defendant herein aided and abetted and rendered substantial assistance in the wrongs complained of herein. In taking such actions as particularized herein, to substantially assist the commission of the wrongdoing complained of, each Defendant acted with knowledge

11

of the primary wrongdoing, substantially assisted the accomplishment of that wrongdoing, and was aware of his or her overall contribution to, and furtherance of, the wrongdoing. Defendants' acts of aiding and abetting, included the acts each of them are alleged to have committed in furtherance of the conspiracy, common enterprise and common course of conduct complained of herein.

## CLASS ACTIONS ALLEGATIONS

37.     Plaintiff brings this action on its own behalf, and as a class action on behalf of all holders of the common stock of the Company (except Defendants herein and any person, firm, trust, corporation, or other entity related to, affiliated with, or controlled by any of the Defendants, as well as the immediate families of the Individual Defendants) and their successors in interest, who are or will be threatened with injury arising from Defendants' actions as more fully described herein (the "Class").

38.     This action is properly maintainable as a class action.

39.     The Class is so numerous that joinder of all members is impracticable. As of March 9, 2012, there were approximately 14,408,542 shares of Midas common stock, including restricted shares, issued and outstanding, owned by hundreds, if not thousands, of shareholders.

40.     There are questions of law and fact which are common to the Class including, inter alia, the following:

    (a)     whether the Individual Defendants have fulfilled and are capable of fulfilling their fiduciary duties owed to Plaintiff and the Class, including, but not limited to, the duties of undivided loyalty, independence, due care, candor, and good faith;

    (b)     whether the Individual Defendants have breached their fiduciary duty to undertake a fair sale process to secure and obtain the best price reasonable under the circumstances for the benefit of Plaintiff and other Class members;

(c)     whether Plaintiff and the other members of the Class will be irreparably damaged if Defendants are not enjoined from continuing the conduct described herein, or alternatively, whether they have suffered compensable damages;

(d)     whether the Individual Defendants are engaging in self-dealing and enriching themselves and other insiders or affiliates of Midas in connection with the Proposed Transaction;

(e)     whether the Individual Defendants, in bad faith or for improper motives, have impeded or erected barriers to discourage other offers for the Company or its assets;

(f)     whether Defendants aided and abetted the Individual Defendants' breaches of fiduciary duties of candor, due care, good faith, and loyalty with respect to Plaintiff and the Class as a result of the conduct alleged herein;

(g)     whether the consideration payable to Plaintiff and the Class under the Proposed Transaction is unfair and inadequate; and

(h)     whether Plaintiff and the Class are entitled to injunctive relief, damages, or other relief.

41.     Plaintiff is committed to prosecuting this action and has retained competent counsel experienced in litigation of this nature. The claims of Plaintiff are typical of the claims of other members of the Class and Plaintiff has the same interests as the other members of the Class. Plaintiff will fairly and adequately represent the Class.

42.     Defendants have acted in a manner which affects Plaintiff and all members of the Class alike, thereby making appropriate injunctive relief and/or corresponding declaratory relief with respect to the Class as a whole.

43.     The prosecution of separate actions by individual members of the Class would create a risk of inconsistent or varying adjudications with respect to individual members of the Class, which would establish incompatible standards of conduct for defendants, or adjudications with respect to individual members of the Class which would, as a practical matter, be dispositive of the interests of other members or substantially impair or impede their ability to protect their interests.

44.     Preliminary and final injunctive relief on behalf of the Class as a whole is entirely appropriate because Defendants have acted, or refused to act, on grounds generally applicable, and causing injury to, the Class.

## SUBSTANTIVE ALLEGATIONS

### The Proposed Transaction

45.     On March 12, 2012, pursuant to the unanimous approval of the Company's Board, Midas entered into the Merger Agreement with TBC, whereby TBC would acquire Midas for $11.50 in cash for each outstanding share of Midas common stock owned. The Company's March 13, 2012 press release announcing the Proposed Transaction states in pertinent part:

> TBC Corporation and Midas, Inc. (NYSE: MDS) today announced that they have entered into a definitive merger agreement, pursuant to which TBC will acquire Midas through a cash tender offer at $11.50 per share. The all-cash transaction is valued at approximately $310 million, including the assumption of approximately $137 million in debt and pension liabilities.

> \*\*\*

> The proposed transaction has been unanimously approved by the boards of directors of both companies. In addition, Midas Chairman, President and Chief Executive Officer Alan Feldman has signed a tender and voting agreement in support of the offer.

> TBC Chairman and Chief Executive Officer Lawrence Day commented, "With nearly 2,300 locations worldwide, Midas is a leader in automotive services and we are very excited to welcome such an iconic brand into our portfolio. By combining the strengths of Midas' platform with our industry expertise and

financial resources, we will build on their current momentum and take the company to the next level."

\*\*\*

Under the terms of the merger agreement, TBC will commence a cash tender offer no later than March 28, 2012. The closing of the transaction is expected to occur by the end of the second quarter, and is subject to customary terms and conditions, including regulatory clearance under the Hart-Scott-Rodino Antitrust Improvements Act. The merger agreement also provides for customary termination fees payable by Midas under certain circumstances and a provision under which Midas has agreed not to solicit any competing offers.

Morgan Joseph TriArtisan LLC is acting as financial advisor to TBC and Morgan, Lewis & Bockius is acting as legal advisor. J.P. Morgan Securities LLC is acting as the financial advisor to Midas and Kirkland & Ellis LLP is acting as legal advisor.

46.     The Tender Offer expires April 24, 2012, and theProposed Transaction is expected to close in the second quarter of 2012, subject to, *inter alia*, (i) the minimum tender offer condition of 50% of shares outstanding plus one, and (ii) customary closing terms and conditions, including regulatory clearance under the Hart-Scott-Rodino Act.

47.     As disclosed in the March 13, 2012 press release, concurrently with the execution and delivery of the Merger Agreement, Defendant Feldman and the Alan D. Feldman Irrevocable 2010 Midas Grantor Annuity Trust (the "Feldman Trust") entered into a tender and support agreement (the "Support Agreement") with TBC and Gearshift whereby Feldman committed to tender all of his and the Feldman Trusts' shares of Common Stock in the Tender Offer and vote all of his shares in favor of the Proposed Transaction and against any competing acquisition offer. Including Company stock options to be exercised pursuant to the Support Agreement, Feldman and the Feldman Trust hold approximately 9.7% of the Company's common stock.

## THE BOARD BREACHED ITS FIDUCIARY DUTIES

**A.     Midas Has Experienced Continued Success And Is Well Positioned For Future Success And The Per Share Consideration Is Inadequate To Shareholders**

48.     The $11.50 Per Share Consideration does not adequately reflect the fair value of Midas.

49.     Indeed, the Proposed Transaction comes at a time when Midas is experiencing financial success and executing on its growth strategy through value priced oil changes and co-branding.

50.     Midas has been in the business of selling automotive repair franchises since 1956. Through March of 2008, the Company's sole franchise concept was Midas auto repair centers. In April of 2008, Midas acquired the SpeeDee franchise system and now sells Midas, SpeeDee and Midas-SpeeDee co-branded franchises.

51.     On August 4, 2011, the Company issued a press release announcing its financial results for the second quarter 2011 wherein the Company highlighted:

- Earnings had more than doubled to $0.15 per diluted share;
- All business units, including company-operated shops, were profitable;
- U.S. comparable shop sales were up 2.2 percent; and
- Company-operated shop comparable retail sales were up 4.5 percent.

52.     In the August 4, 2011 press release, the Company further reported that it had achieved solid progress during the quarter on its core strategy to co-brand Midas and SpeeDee shops as a means to accelerate top-line growth and profitability across the network. With three additional shops added in the second quarter, the total number of co-branded shops reached 51. Defendant Feldman stated that "[T]he positive trend in retail sales continues as comparable shop sales at Midas shops in the United States were up by 2.2 percent, the seventh consecutive quarter of increases . . . average daily car count at U.S. Midas shops increased by two percent during the quarter—following a four percent increase in the first quarter and a 10 percent increase for all of

2010 [and] . . . positive sales trends we experienced at Midas shops in the first half of the year have continued into the third quarter, with preliminary reports for July showing a comparable shop sales increase per selling day of more than four percent for U.S. Midas shops."

53.     On August 11, 2011 the Company issued a press release wherein Defendant Feldman commented on the Company's strategic position and value, stating "the company continues to make solid progress in increasing sales at franchised and company-operated shops, in co-branding of Midas and SpeeDee locations and in improving profitability. Despite the company's improving performance, the board feels that the current market valuation of Midas does not reflect the underlying value of its assets and prospects for future growth."

54.     On October 7, 2011, the Company issued a press release announcing its financial results for the third quarter 2011 wherein the Company highlighted:

•       Earnings had increased by 67 percent compared to third quarter 2010 to $0.10 per diluted share after special items of $0.05 per share;

•       U.S. and Canadian comparable shop sales were up 3 percent; and

•       Company-operated shop comparable sales were up 4.6 percent.

55.     In the October 7, 2011 press release Defendant Feldman stated "[W]e continued to make solid progress during the quarter in executing our growth strategies, including co-branding our shops, reducing our inventory of company-operated shops and attracting new high quality franchisees. We are especially encouraged by improving trends in retail sales and operating income, and have now delivered eight consecutive quarters of positive comparable shops sales at U.S. Midas shops. Midas shops continue to drive traffic with value-priced oil changes, which, in turn, has led to growing customer awareness about the breadth of our auto repair and maintenance services." The press release went on to state that during the quarter, the

17

Company advanced its strategy of co-branding Midas and SpeeDee shops, by adding 13 additional co-branded shops bringing the total to 64, advancing its strategy of co-brandings expected to drive Midas' accelerated top-line growth and profitability across the network.

56.     According to an investor presentation at the Gabelli Automotive Conference in Las Vegas, dated November 1, 2011 and published on the Midas website, the Company's shops are generating annual sales of more than $1.5 billion, the established and growing market for Midas services is $152 billion and there is a positive long-term market outlook of 4% annual growth.   The investor presentation also included the following information concerning the Company's performance:

•       Eight consecutive quarters of increased same store sales at U.S. Midas shops – 10 consecutive quarters of increased same store sales at company-owned stores;

•       Co-branding of Midas/SpeeDee locations will transform system – 14% average sales increase in third quarter among 17 franchised Midas shops that added SpeeDee oil changes;

•       Third quarter 2011 profits increase by 67 percent compared to third quarter 2010;

•       Third quarter 2011 YTD operating margin was up 3.1 percentage points, and Selling General & Administrative ("SG&A") expenses were down $1.8 million; and

•       Free cash flow per share was $1.10 in first three quarters 2011 versus $1.02 for full-year 2010.

57.     On March 1, 2012, the Company issued a press release announcing its financial results for the 2011 fiscal year, which ended December 31, 2011 wherein the Company highlighted:

•       U.S. comparable shop sales increase by 1.1 % in fourth quarter 2011;

- U.S. company-operated shops comparable sales up by 4.4% in fourth quarter 2011; and

- 2011 full-year adjusted operating income increases by 25%.

58.  The Company further reported in its March 1, 2012 press release that for its fiscal year 2011, net earnings were $4.0 million and diluted earnings per share were $0.28. In the press release, Defendant Feldman stated that "[t]he positive trends we have been seeing in retail sales continued throughout 2011, marking nine consecutive quarters of positive comparable shop sales in U.S. Midas shops." Defendant Feldman further stated "[w]e continue to execute on our growth strategy of building retail sales at existing shops through value-priced oil changes and by co-branding, of transitioning under-performing shops and available closed shops through re-franchising and through improving profitability at company-operated shops . . . We are optimistic that the positive trends in retail sales will continue in 2012, while remaining aware of the potential negative effect of higher fuel prices on driving patterns and consumer spending."

59.  In light of the recent success of Midas and its bright prospects for future success based on, among other things, Midas' co-branding initiative the Per Share Consideration is inadequate.

60.  In addition, the Per Share Consideration fails to adequately compensate Midas' shareholder for the synergistic value to TBC created by the Proposed Transaction. The Proposed Transaction is a valuable strategic merger for TBC. As Defendant Feldman stated in an Employee Meeting on March 13, 2012 "[TBC] [w]ant[s] to invest and, you know, they're a subsidiary of Sumitomo Corporation – a $48 billion business in Japan. And, you know, they want to invest and grow in the United States and Canada. So this is a very important strategic acquisition for them to allow them to continue to expand their business." Later in the March 13

meeting, in response to a question concerning TBC's role as a supplier of tires for Midas shops,

Defendant Feldman stated:

> "[w]ell I would assume they bought us because they're sure hoping they're going to be a
> supplier of tires to us. And look at the tire business as a tremendous opportunity inside
> the Midas system . . . . That's part of why this was so strategically compelling for them,
> right. To be able to have access to the 1700 shops in North America and they're
> interested in international expansion as well. I mean they look at, you know, that the
> Midas footprint is in other countries and want to continue to grow."

Additionally, TBC stands to gain an ownership interest in more than 2,250 locations worldwide

currently held by Midas as a result of the Merger. In sum, the Board has failed to secure a fair

price for the Company in light of the intrinsic value of its assets as well as the value of the

Company's assets to TBC.

61. Rather, as set forth in greater detail below, the Company's entry into the Proposed

Transaction is the product of a flawed process designed to ensure the sale of Midas to TBC on

terms harmful to Plaintiff and the other public shareholders of Midas and favorable to TBC and

the Company's insiders.

**B. Inadequate Process Leading To The Tender Offer And The Merger**

62. Midas and the Individual Defendants engaged in a flawed negotiation and sales

process that was clearly tainted by conflicts of interest, and they did not act for the benefit of the

shareholders of the Company. More specifically, the Company and the Individual Defendants

undertook an unfair process engineered towards consummating a merger with favored TBC that

germinated from the long tenure of Midas' lead director Defendant Schoeberl on TBC's board

and featured the engagement of a seriously conflicted financial advisor with an enormous

financial interest in TBC's parent company Sumitomo. This flawed and conflicted process

culminated in a rush to consummate the merger with TBC despite the continued active interest

from the primary competing bidder. By hastily shutting down the process in the face of the

competing bidder's willingness to raise its bid, the Special Committee failed to assure that they had achieved the highest price for Midas' shares.

63. According to the 14D-9, the initial step leading to the Proposed Transaction was the Company's April 2011 decision to request that J.P. Morgan prepare a valuation analysis of the Company for the Board, so that the Board would be prepared to evaluate an offer to purchase the Company should the Company receive a proposal. The 14D-9 does not, however, disclose what prompted the decision to request J.P. Morgan's valuation analysis at this time, why the Company and/or Board believed an offer to purchase the Company was imminent, or on what basis J.P. Morgan had been chosen to perform the valuation.

64. J.P. Morgan's preliminary views on the Company's valuation were discussed with the Board on May 10, 2011.

65. Sometime in May 2011, Defendant Feldman received unsolicited calls from a private equity firm ("Financial Buyer A") and from Company A, expressing interest in exploring a possible purchase of the Company. These initial indications of interest led to a May 31, 2011 dinner with Defendant Feldman where the chief executive officer of Company A expressed its interest in purchasing the Company for $10.00 per share in cash and a June 9, 2011 call to Defendant Feldman from Financial Buyer A expressing an interest in purchasing the Company for $9.50 per share in cash.

66. According to the 14D-9, the Board was first advised of the "indication of interest" from Financial Buyer A and Company A at the August 8, 2011 Board meeting even though the indications of interest had occurred over two months prior. In response, the Board requested that J.P. Morgan complete additional valuation work, although the 14D-9 does not explain the reasons behind this request by the Board.

67. On August 11, 2011, the Company issued a press release publicly announcing that it would evaluate strategic alternatives and that it had retained J.P. Morgan to assist the company in exploring strategic alternatives.

68. The very next day, on August 12, 2011, J.P. Morgan was contacted by Morgan Joseph TriArtisan LLC ("Morgan Joseph"), TBC's financial advisor, regarding the Company's announcement. On August 16, 2011, J.P. Morgan contacted Morgan Joseph, at which point Morgan Joseph expressed TBC's interest in entering the process announced by the Company as a potential bidder in a transaction involving Midas. The 14D-9 does not disclose whether any contact or communication between the Company and/or J.P. Morgan and Defendant Schoeberl played a role in TBC's interest in acquiring Midas. Moreover, the 14D-9 provides no detail concerning the basis for retaining J.P. Morgan to assist the Company in exploring strategic alternatives, whether other advisors were considered or whether the Board considered J.P. Morgan's conflict, with respect to Sumitomo, once TBC contacted J.P. Morgan.

69. Although the process had already been tilted towards TBC by virtue of Schoeberl's close ties with both TBC and Midas, on August 23, 2011, J.P. Morgan started a purported "auction" process by contacting parties that might be "interested" in a transaction involving the Company.

70. As further evidence that TBC was the favored party, on September 13, 2011 J.P. Morgan sent a proposed non-disclosure and standstill agreement to Morgan Joseph for delivery to TBC which was executed by the Company and TBC on September 21, 2011. However, the 14D-9 does not disclose what if any steps the Board took at this time to address the serious conflicts of interest posed by having its Lead Director, Defendant Schoeberl, sit on both the

Company's Board and TBC's board, or why at least two more Board meetings were held before formation of the Special Committee almost two months later.

71.     During the first week of November 2011, the Company received communications from eight parties expressing interest in purchasing the Company, with bids ranging between $8.50 to $14.00 per share in cash.

72.     On November 7-8, 2011, the Board held a meeting at which J.P. Morgan reviewed the Company's strategic alternatives as well as the preliminary indications of interest. The Board also discussed the possible conflicts of interest that existed based upon Defendant Schoeberl's 17 years of service as a member of TBC's board of directors as well as the large monetary payments to which Defendant Feldman would be entitled upon a change in control of the Company. In light of these conflicts, the Board formed of the Special Committee to evaluate bids and other strategic alternatives to be considered during the process. Despite its enormous financial interest in TBC's parent Sumitomo and resultant potential conflict of interests created thereby, the Special Committee recommended that J.P. Morgan be formally retained as financial advisor. The 14D-9 again fails to disclose what steps the Board took, if any, to assure there were no potential conflicts of interest, if any other financial advisors were considered or would have been more appropriate, or if the Board was at this time even aware of J.P. Morgan's financial entanglement with Sumitomo.

73.     At a November 8, 2011 meeting the Special Committee resolved to permit four bidders to continue the sale process, including TBC, Company A, Company B and Financial Buyer B. Two additional bidders, Financial Buyer C and Financial Buyer D, were invited to continue at the Special Committee meeting of November 22, 2011. The 14D-9 does not disclose any details concerning why these six bidders were chosen to continue with the bidding process.

74.    On December 9, 2011, J.P. Morgan reviewed three management presentations made that week to certain bidders. The Special Committee also discussed the status of the legal dispute regarding the strategic alliance and license agreement between the Company and Mesa S.p.A. ("Mesa"). The 14D-9 provides no detail concerning the content of management's presentations, including assumptions or projections, if any, that were relied upon by management and communicated to the bidders

75.    On December 18, 2011, the Company and the Special Committee executed an engagement letter retaining J.P. Morgan as an advisor for the ongoing process. The 14D-9 does not disclose whether the Board or the Special Committee ever performed an adequate conflict check or considered J.P. Morgan's financial interest in Sumitomo between the time the Special Committee resolved to retain J.P. Morgan as advisor on November 7-8 and the execution of the engagement letter on December 18, 2011.

76.    On January 3, 2012, the Company received a complaint filed by Mesa in Milan, Italy alleging that the Company was in breach of the strategic alliance and license agreements between the parties ("Mesa Litigation").

77.    On January 6, 2012, the Special Committee determined that the bidders should be asked to indicate all relevant assumptions utilized in making their bids, including any specific assumptions relating to the Company's European business and the Mesa dispute.

78.    On January 9, J.P. Morgan sent a bid process letter to TBC, Company A and Company B explaining the process for the second round of bid proposals.

79.    On January 12, 2012, TBC raised its bid to a range of $12.25-$14.00 per share in cash from $12.00-$14.00 per share in cash, dependent upon whether the Company was able to reach a settlement with Mesa.

80. Between December 15, 2011 and January 19, 2012 Financial Buyers B, C and D and Company B dropped out of the process. The 14D-9 fails to disclose any details concerning those parties' withdrawal from the process.

81. On January 27, 2012, Company A increased its bid to $10.00 per share and expressed a willingness to pay up to 50% of the consideration in Company A stock.

82. During the week of January 30, 2012 representatives of TBC and Sumitomo met with representatives of the Company in Itasca, Illinois to conduct further due diligence on the Company.

83. On February 17, 2012, J.P. Morgan advised the Special Committee that TBC had raised issues that might cause it to lower its bid. These issues included the Mesa Litigation, a Canadian class action filed by Canadian Midas franchisees in 2007 alleging various violations of the franchise agreement and breaches of duties of good faith and fair dealing ("Canadian Class Action"), and the Company's underfunded pension. The 14D-9 fails to disclose, however, sufficient details concerning the Mesa Litigation, Canadian Class Action and the Company's underfunded pension, or whether these factors caused TBC to lower its bid.

84. On February 24, the Special Committee determined that a larger percentage of cash (as opposed to Company A common stock) would be preferable to and in the best interests of the Company's stockholders even though Company A's financial advisor had indicated that Company A might have some flexibility with respect to the mix of stock and cash as consideration. The 14D-9 does not disclose the basis of this determination and whether the Special Committee's determination discouraged Company A from increasing its bid.

85. The process was so tilted in favor of TBC that on February 29, 2012, the very day that the Company was informed that the Sumitomo investment committee voted to lower TBC's

bid from $12.25-$14.00 to $11.25, the Company executed a non-disclosure agreement with TBC, permitting the Company to review TBC's financial statements in anticipation of finalizing the Proposed Transaction.

86.     On March 1, 2012, J.P. Morgan instructed TBC and Company A to submit a final binding offer by March 6, 2012.

87.     On March 6, 2012, J.P. Morgan received Company A's offer of $10.50 per share with 100% of the consideration payable in Company A stock.

88.     On March 7, 2012, Morgan Joseph relayed to J.P. Morgan TBC's best and final price of $11.50 per share that included a support agreement from Defendant Feldman in favor of the Proposed Transaction.

89.     On March 9, 2012, the Special Committee directed J.P. Morgan to request that Company A and TBC raise their bids due to the fact that the amount of the Company executive change in control payments might be lower than they had been led to believe when the two bidders had submitted their final bids. Company A increased its offer to $10.75. TBC refused to increase its final proposal.

90.     Despite Company A continuing to increase its bid, TBC significantly lowering its bid, TBC's unwillingness to take into account the target equity grant change-in-control payments and TBC's reluctance to provide any deal guarantee or otherwise alter its bid, on March 12, 2012, the Special Committee unanimously resolved to recommend to the Board that it approve the Merger Agreement, based upon J.P. Morgan's fairness opinion delivered earlier that day. The Board met immediately following the meeting of the Special Committee and approved the Merger Agreement and the Proposed Transaction and resolved to recommend that the holders of the Company's common stock accept the Tender Offer and tender their shares.

91.     On March 13, 2012 before the opening of trading on the NYSE, the Company and

TBC issued a joint press release announcing the execution of the Merger Agreement.

## C.   **The Board Relied On A Conflicted Advisor**

92.     J.P. Morgan's service as Midas' financial advisor as to the Proposed Transaction

posed an irreconcilable conflict of interest. The 14D-9 discloses that:

> "J.P. Morgan's commercial banking affiliate is a lender to the Company, and certain of
> J.P. Morgan's affiliates also provide credit card services and treasury and cash
> management services to each of the Company and Sumitomo Corporation and their
> respective affiliates. . . .
>
> Based on information available at the time J.P. Morgan rendered its opinion and as was
> disclosed to the Special Committee and the Board and in the J.P. Morgan opinion
> attached to this Schedule 14D-9, J.P. Morgan believed that it and its affiliates held
> common stock or options to purchase common stock of Sumitomo Corporation
> representing in the aggregate approximately 7% of Sumitomo Corporation's common
> stock. Since rendering its opinion, J.P. Morgan has learned that 6.354% out of what was
> disclosed as an approximately 7% ownership interest actually represents a share collar
> transaction with respect to Sumitomo Corporation's common stock executed more than
> two years preceding the date of J.P. Morgan's opinion by one of J.P. Morgan's affiliates
> on behalf of a customer. In the ordinary course of its businesses, J.P. Morgan and its
> affiliates may actively trade the debt and equity securities of the Company and Sumitomo
> Corporation for their own account or for the accounts of customers and, accordingly, they
> may at any time hold long or short positions in such securities."

93.     Sumitomo Corporation has a market cap of 1476.96B Japanese yen or

approximately $18 billion dollars. Thus, J.P. Morgan's overall 7% interest in Sumitomo

Corporation is worth approximately $1.2 billion dollars. J.P. Morgan's stake in Sumitomo

Corporation, notwithstanding the 6.354% Share Collar Transaction, amounts to approximately

$115 million.

94.     J.P. Morgan's ownership interest in Sumitomo coupled with its interest in the

Share Collar Transaction is, at best, a potentially serious conflict of interest as it provided the

bank with a strong financial incentive to steer the Board and/or the Special Committee away

from any other bidders or strategic alternatives and towards a transaction with TBC, regardless

of the merits of these other competing strategies or bids. A target company's advisor with such an enormous interest in an acquiring company, whether that interest is direct or indirect, would naturally owe a duty of loyalty to the acquiring company rather than the target company and their shareholders. Based on its significant interest in Sumitomo, J.P. Morgan had a strong incentive to make sure that TBC paid as little as possible for Midas, that TBC was the favored party, and that the terms of the Proposed Transaction with TBC was deemed fair.

95. It is especially egregious that the Individual Defendants, in breach of their fiduciary duties owed to Plaintiff and the Class, did not seek a separate fairness opinion from an independent and unconflicted financial advisor after the Board was apprised by J.P. Morgan at the time it delivered its fairness opinion that J.P. Morgan and its affiliates held an approximately 7% interest in Sumitomo worth approximately $1.2 billion dollars.

96. The Board – tasked with the unremitting duty to obtain the maximum price reasonably obtainable for Midas' shareholders – simply had no business relying upon a financial advisor with such conflicts of interest. J.P. Morgan's conflicts tainted the entire sale process, preventing the Board from discharging its fiduciary duties to Midas' shareholders.

97. In addition, J.P. Morgan had another strong financial incentive to recommend approval of the Proposed Transaction. For its advisory services and rendering of a fairness opinion, J.P. Morgan will receive a fee of $4.5 million, $3.5 million of which is payable only if the Proposed Transaction is consummated. The back-loaded, contingent nature of J.P. Morgan's fee unduly incentivizes it to opine that the Proposed Transaction is financially fair.

**D.    Midas Insiders, Including The Individual Defendants, Receive
        Special Benefits Not Available To Plaintiff And Other Class Members**

28

98.     On August 11, 2011, the Company filed a Form 8-K with the SEC wherein it announced that its Board "will explore and evaluate a range of strategic and financial alternatives to enhance the value for stockholders."

99.     Approximately six months prior to the announcement that it would explore strategic alternatives, the Company implemented an employee stock option program pursuant to which all executives that held stock options with exercise prices ranging from $15.22 to $23.99 were offered the opportunity to exchange their existing stock options for a lesser number of replacement stock options with an exercise price of $7.52. This option swap was offered to allow management to benefit from sale of company at a price above $7.52 per share.

100.    According to Midas' Schedule 14A filed with the SEC on April 8, 2011, executive management was able to exchange their out-of-the-money options for 238,483 in-the-money options, having a value of $1.79 million based upon the $7.52 exercise price of the replacement options. Defendant Feldman received approximately 151,000 of the replacement options. Indeed, under the terms of the Merger Agreement, all of Defendant Feldman's unvested options will vest and become exercisable. Based upon the Per Share Consideration, the vested and unvested options owned by Defendant Feldman will entitle him to over $3.8 million.

101.    Having decided to put itself up for sale in August of 2011, Midas insiders were interested in deal certainty to achieve their exit strategy and advance their own interests, in breach of their fiduciary duties and to the detriment of Plaintiff and the Class. Initiating a sham "auction" process and tilting the subsequent process in favor of TBC (including reliance on an advisor beholden to TBC) was the surest path for insiders to secure their change in control payday.

102. The Individual Defendants failed in their responsibility to act independently to protect the interests of Midas' shareholders and failed to conduct fair and active bidding process to assure that shareholders received the highest price possible for their investment.

**E.    The Merger Agreement Unfairly Deters Competitive Offers**

103. In addition to Defendants' breaches of fiduciary duty concerning price process, and conflicts of interest, the Merger Agreement executed by the Defendants unreasonably and unfairly deters competitive offers for the Company.

104. For example, pursuant to Section 10.3(d) of the Merger Agreement, the Company has agreed to pay a termination fee of $6.88 million payable to TBC in certain circumstances, including if the Company terminates the Merger Agreement because the Board determines to pursue another alternative superior offer. The termination fee represents roughly 4% of the equity value of the Proposed Transaction.

105. Section 6.2 of the Merger Agreement severely restricts the Board's ability to enter into discussions and negotiations involving a competing takeover proposal (the "No-Shop Provision"). Specifically, Section 6.2(a) of the No-Shop Provision provides that the Company shall immediately cease any discussions or negotiations with any parties that may be ongoing with respect to any acquisition proposal. Section 6.2(b) provides, among other things, that the Company and its representatives shall not solicit, initiate or otherwise encourage any competing acquisition proposal or provide any party with non-public company information with respect to an acquisition proposal. Further, Section 6.2(f) of the No-Shop Provision provides that the Company must promptly notify TBC of any such competing acquisition proposals.

106. The Merger Agreement also includes a matching-rights provision. Section 6.3(a) of the Merger Agreement provides that Midas shall give TBC three business days to match any superior competing offer that Midas may receive. Specifically, Midas is required to provide

prior written notice to TBC if the Board intends to change its recommendation and permit TBC the opportunity to adjust the terms of the Proposed Transaction so that TBC is able to match the terms of any competing offer, prior to the Board approving or recommending any such superior offer.

107. In connection with the Merger Agreement, as a condition of its willingness to enter into the Merger Agreement, TBC required Defendant Feldman to enter into a Tender and Support Agreement. Under the terms of Tender and Support Agreement, Defendant Feldman agreed to tender all of his shares in the Tender Offer and vote all of his shares in favor of the Merger Agreement and against any competing acquisition offer.

108. In sum, by acceding to the foregoing protections, the Board has tied its own hands and has deterred other potential bidders.

## MISLEADING NATURE OF THE 14D-9

### *The 14D-9 fails to disclose material information regarding the sales process*

109. On March 28, 2012, in order to secure that Midas' shareholders tender their shares, Defendants filed the materially misleading 14D-9 in contravention of §§ 14(d), (e), and 20(a) of the Exchange Act, Rule 14D-9, and the Individual Defendants' duties of candor and full disclosure. The 14D-9 fails to provide the Company's shareholders with material information and/or provides them with materially misleading information which renders shareholders unable to make a fully informed decision as to tendering their shares or potentially casting a vote regarding the Proposed Transaction.

110. The 14D-9 fails to disclose whether the Board and the Company's management in its regular review of the Company's strategic options considered a business combination with TBC, or whether or to what extent Defendant Schoeberl discussed a merger with TBC during these reviews.

31

111. The 14D-9 fails to disclose the bases for the Company enlisting J.P. Morgan to prepare a valuation analysis of the Company for the Board in April 2011, and why the Board felt it might be necessary at that time to be "prepared to evaluate an offer to purchase the Company" should the Company receive such a proposal.

112. The 14D-9 fails to disclose in sufficient detail the timing when Defendant Feldman received unsolicited calls from Financial Buyer A and Company A expressing interest in exploring a possible purchase of the Company. If these calls were received before J.P. Morgan's views on the Company's valuation were discussed with the Board on May 10, 2011, it begs the question as to why the Board was not informed about these calls and whether the Company was engineered towards a sale process without the input of its Board.

113. The 14D-9 fails to disclose why the Company and/or Defendant Feldman waited until August 2011 to inform the Board of Financial Buyer A and Company A's May and June 2011 offers to purchase the Company.

114. The 14D-9 does not disclose why the Board requested that J.P. Morgan complete additional valuation work with respect to the Company on August 8, 2011, any details of the specifics of this additional valuation, or whether J.P. Morgan's earlier valuations were deficient.

115. The 14D-9 fails to disclose how many other parties, besides TBC, contacted the Company or J.P. Morgan during the time period between the August, 11, 2011 press release announcing that the Company was evaluating a range of strategic and financial alternatives and August 23, 2011, when the sale process was undertaken.

116. The 14D-9 fails to disclose whether the Board was apprised of TBC's initial contact with J.P. Morgan on August 12, 2011 and TBC's subsequent interest in entering the process expressed by TBC on August 16, 2011.

117.    Moreover, the 14D-9 fails to disclose whether the Board was informed after TBC entered the process on August 12, 2011, of J.P. Morgan's financial interest in TBC's parent company Sumitomo and potential conflicts engendered thereby.

118.    Although the 14D-9 lists the number of parties contacted by J.P. Morgan during the August 23 – September 26, 2011 "auction," it fails to disclose the factors or criteria by which the parties were chosen or considered, or what, if anything, the Board instructed J.P. Morgan to communicate to the parties.

119.    The 14D-9 fails to disclose why the Company waited until November 7-8, 2011, over seven weeks after executing the non-disclosure and standstill agreement with TBC on September 21, 2011, to acknowledge Defendant Schoeberl's conflict of interest based on his longstanding directorship with TBC.

120.    The 14D-9 fails to disclose the basis of the Special Committee's decision to retain J.P. Morgan at the November 8, 2011 Board meeting, including whether the Special Committee undertook a process to evaluate J.P. Morgan's conflicts of interest with respect to TBC or the other parties who had submitted first round bid proposals, whether other advisors were considered, and what other factors were considered in selecting J.P. Morgan as financial advisor.

121.    Although the 14D-9 discloses that between November 8 and 22, 2011 six bidders were chosen to continue the process, it does not disclose any details concerning the basis of why the six were selected or why other bidders were excluded.

122.    Although the 14D-9 disclosed that Financial Buyers B, C, D, and Company B dropped out of the process between December 15, 2011 and January 19, 2012, it fails to disclose any details concerning those parties' withdrawal.

123.    The 14D-9 fails to identify the specific representatives of TBC and Sumitomo who met with representatives of Midas during the week of January 30, 2012 to conduct due diligence on the Company. Moreover, the 14D-9 fails to disclose if representatives from J.P. Morgan were present and if Sumitomo had specific contacts with J.P. Morgan.

124.    The 14D-9 fails to set forth the reasons behind Kirkland & Ellis' request on February 21, 2012 that Sumitomo provide a guarantee of TBC's obligations under the merger agreement.

125.    The 14D-9 fails to disclose the price flexibility Company A had with respect to a mix of stock and cash as consideration, and whether the Special Committee's determination to favor cash over stock discouraged Company A from more aggressively raising its bid.

126.    The 14D-9 fails to disclose details of the Sumitomo investment committee meeting that resulted in TBC lowering its bid to $11.25 per share in cash on February 29, 2012, and whether the lowered bid was tied to assumptions concerning the Mesa Litigation, Canadian Class Action or Midas' underfunded pension. Moreover, the 14D-9 fails to disclose whether representatives of J.P. Morgan attended this investment committee meeting.

127.    Given the apparent significance of the Mesa Litigation, Canadian Class Action and underfunded pension, the 14D-9 fails to disclose sufficient detail concerning these factors, including their effect on Midas' valuation and to what extent Company A or any other bidder took these factors into consideration when formatting their bids.

128.    The 14D-9 fails to disclose the key material differences between the keep well agreement from Sumitomo and the guarantee from Sumitomo sought by Midas, and why Sumitomo refused to provide a guarantee.

129.    In light of the Company's recent success and optimistic co-branding initiative, the 14D-9 fails to disclose why the Company's continued existence as a stand-alone company, a key strategic alternative analyzed by J.P. Morgan at various times throughout the sales process and discussed with the Board, was rejected as a viable alternative.

130.    The 14D-9 fails to disclose why the Special Committee did not instruct J.P. Morgan to continue to negotiate with Company A after Company A raised its bid to $10.75 on March 9, 2012 (despite having made its "best and final offer" of $10.50 on March 6, 2012.)

131.    14D-9 fails to disclose why the Special Committee and Board rushed to approve the Merger with TBC on March 12, 2012 despite TBC having significantly lowered its bid from $12.25 - $14.00 to $11.25, TBC refusing to raise its bid above $11.50, TBC refusing to guarantee the Merger; and Company A continuing to increase its bid for Midas.

132.    The 14D-9 fails to disclose to what extent, if any, the Board or Special Committee considered seeking a separate fairness opinion from an independent and unconflicted financial advisor after J.P. Morgan informed the Special Committee and the Board on March 12, 2012, at or about the time it delivered its fairness opinion, that it and its affiliates had a financial interest in TBC's parent Sumitomo representing 7% of Sumitomo's common stock worth an estimated $1.2 billion.

133.    The 14D-9 fails to disclose whether at any period between the time TBC first entered into the sale process on August 15, 2011 and March 12, 2012 when J.P. Morgan rendered its fairness opinion, the Special Committee performed any conflict check to uncover J.P. Morgan's substantial involvement with Sumitomo.

134.    The 14D-9 fails to disclose whether all of Midas' Board members including Defendant Schoeberl, were present to vote to approve the Tender Offer and Merger Agreement

and the transactions contemplated thereby and to recommend the Tender Offer to the holders of the Company's common stock.

### The 14D-9 fails to disclose material financial information

135.    The 14D-9 fails to provide Midas' shareholders with material financial information and/or provides them with materially misleading information, thereby precluding Midas' public shareholders from making an informed decision with respect to the Proposed Transaction.

### Firm Value

136.    With respect to the *Public Trading Multiples Analysis*, *Selected Transaction Analysis* and *Discounted Cash Flow Analysis* sections, the 14D-9 fails to define the Firm Value, or "FV" for the Company and how J.P. Morgan arrived at this FV for the Company. The 14D-9 should disclose how J.P. Morgan determined the FV for the Company as it is the key component utilized by J.P. Morgan in arriving at equity value per share. This information is critical to shareholders as the *Public Trading Multiples Analysis, Selected Transaction Analysis* and *Discounted Cash Flow Analysis* sections are presented on an equity value per share basis.

### Public Trading Multiples Analysis

137.    With respect to the *Public Trading Multiples Analysis* section the 14D-9 discloses a range from a low of 4.7x to a high of 11.6x for FV/2012E, EBITDA multiples for the selected companies, but only sets forth the median FV/2012E EBITDA multiples for the selected companies broken down by sectors. The 14D-9 should disclose the pricing multiples for each of the selected companies within those sectors allowing shareholders to more accurately compare Midas with the public companies selected.

138.    Further, in the *Public Trading Multiples Analysis*, the 14D-9 fails to disclose J.P. Morgan's rationale in analyzing trading multiples for the Company and selected companies as of March 9, 2012 and for the Company on an average basis for the 3-month, 6-month, 1-year, 2-year and 3-year periods ending on March 9, 2012 based on FV to next twelve months EBITDA. These historical multiples are of little relevance to the Company's current value.

139.    Moreover, with respect to the *Public Trading Multiples Analysis* section, in selecting the multiple reference range, the 14D-9 fails to disclose whether J.P. Morgan considered any other source besides FV/2012 E, EBITDA.

140.    Additionally, in the *Public Trading Multiples Analysis* section the 14D-9 fails to disclose whether the implied "equity value reference range" of the public companies common stock calculated net operating losses ("NOLs"). The 14D-9 should disclose the value of NOLs for the public companies as this is an explicit adjustment J.P. Morgan utilized for the Company in its *Discounted Cash Flow Analysis*.

**Selected Transaction Analysis**

141.    With respect to the *Selected Transaction Analysis* section, the 14D-9 contains an analysis of "selected automotive aftermarket retailer" transactions. The 14D-9 fails to disclose J.P. Morgan's decision to conduct an analysis for only "selected automotive aftermarket retailer" transactions and not for "auto aftermarket retailer" and "service provider and quick service restaurant (franchisor)" transactions, which are two of the categories used by J.P. Morgan in its *Public Trading Multiples Analysis*. The 14D-9 should disclose J.P. Morgan's rationale for omitting these two categories from its *Selected Transaction Analysis*, since they are included and are disclosed to shareholders in the *Public Trading Multiples Analysis* section.

142. Additionally, with respect to the *Selected Transaction Analysis* section the 14D-9 fails to disclose whether NOLs were taken into consideration. The 14D-9 should disclose the value of NOLs for the selected transaction analysis as this is an explicit adjustment J.P. Morgan utilized for the Company in its *Discounted Cash Flow Analysis*.

**Discounted Cash Flow Analysis**

143. The 14D-9 fails to disclose material information concerning J.P. Morgan's *Discounted Cash Flow Analysis*. For example, the 14D-9 generally fails to: (a) disclose the financial projections prepared by Midas' management and provided to J.P. Morgan; and (b) depict the actual discounted cash flow analysis, including projected amounts for each income statement line item for each future year and the terminal period, and the calculation of free cash flow in each period.

144. More specifically, with respect to free cash flow the 14D-9 must disclose the free cash flow projections for years 2012 through 2021 for each of the eight scenarios calculated by J.P. Morgan: (a) Co-Branding Successful 100% Mesa Royalty-including NOLs; (b) Co-Branding Successful 100% Mesa Royalty-excluding NOLs; (c) Co-Branding Successful 20% Mesa Royalty-including NOLs; (d) Co-Branding Successful 20% Mesa Royalty-excluding NOLs; (e) Co-Branding Unsuccessful 100% Mesa Royalty-including NOLs; (f) Co-Branding Unsuccessful 100% Mesa Royalty-excluding NOLs; (g) Co-Branding Unsuccessful 20% Mesa Royalty-including NOLs; and (h) Co-Branding Unsuccessful 20% Mesa Royalty-excluding NOLs.

145. With respect to projections, the 14D-9 must disclose the projections for all line items necessary to calculate the Company's free cash flow projections under each of the eight scenarios set out above, including EBIT, stock-based compensation, capital expenditures, and changes in working capital. These projections and free cash flows are critical to shareholders

informed decision as to whether to tender their shares in support of the Proposed Transaction, because shareholders are being asked to decide whether to take a sum certain at that time in exchange for their right to the Company's future cash flows.

146. Likewise, the 14D-9 must also disclose whether management assigned any probabilities to the relative likelihood of each of the referenced scenarios occurring. This is especially important considering the significant difference of the value range for the Company that each scenario yielded (i.e. the Discounted Cash Flow Analysis yielded a value for the Company between $11.30 to $14.15 for the "Co-Branding Successful, 100% Mesa Royalty-including NOLs" case, but only $5.40 to $7.80 for the "Co-Branding Unsuccessful, 20% Mesa Royalty-excluding NOLs" case).

147. Moreover, with respect to the *Discounted Cash Flow Analysis* section, the 14D-9 should disclose the basis for applying an abnormally low perpetual growth rate ranging from 1.0% to 2.0% to the unlevered free cash flows of the Company. The perpetual growth range employed by J.P. Morgan is below the level of inflation, implying a pessimistic outlook for the Company which is both contradicted by the other financial projections disclosed and inconsistent with the 4% annual growth rate in the industry as set forth in Midas' November 1, 2011 Investor Presentation.

148. Further, the 14D-9 should disclose why the value per share of the NOLs decreases under the "Co-Branding Successful" scenarios. This is a contradiction, because if Midas' co-branding is successful, Midas should be more profitable and able to utilize its NOLs more quickly resulting in a higher per share value for the NOLs. As set forth in the *Discounted Cash Flow Analysis* section, J.P. Morgan presents an assumption whereby the value per share of the NOLs decreases even as the Company's co-branding strategy succeeds. The 14D-9 should

disclose the causes of the value per share of the NOLs decreasing if Midas is successful in its co-branding.

**Financial Projections**

149. With respect to the *Financial Projections* section, the 14D-9 fails to set forth: (a) free cash flows of the Company; and (b) any information relating to the NOLs, a material component that J.P. Morgan set forth in its fairness opinion. The 14D-9 should provide the free cash flows and information relating to the Company's NOLs to allow shareholders to make an informed decision on whether or not to tender their shares in support of the Proposed Transaction.

150. Furthermore, with respect to the *Financial Projections* section, the 14D-9 only sets forth projections for the years 2012 to 2017. The 14D-9 should also include the additional four year extrapolation of these internal forecasts prepared by the management of the Company and relied upon by J.P. Morgan in rendering its fairness opinion to the Board.

**The 14D-9 fails to disclose material information regarding J.P. Morgan's conflicts**

151. The 14D-9 disclosures regarding J.P. Morgan's conflicts are wholly inadequate and leave many more questions unanswered then answered.

152. The 14D-9 fails to disclose the exact timing when J.P. Morgan informed the Board and the Special Committee that it and its affiliates held common stock or options to purchase common stock of Sumitomo representing approximately 7% of Sumitomo's total common stock.

153. Moreover, the 14D-9 fails to disclose the circumstances surrounding J.P. Morgan first learning that 6.354% out of an approximate 7% ownership interest in Sumimoto actually

represents a Share Collar Transaction with respect to Sumitomo's common stock <u>after</u> rendering its fairness opinion on or about March 12, 2012.

154.    The 14D-9 fails to disclose any of the specifics concerning the Share Collar Transaction. Specifically, the 14D-9 fails to disclose with sufficient details the mechanics of the Share Collar Transaction, details of J.P. Morgan's financial interest in Sumitomo based upon the Share Collar Transaction and how this interest is impacted by price movements in Sumitomo common stock. This is a critical issue to Midas shareholders because whether it is direct or derivative, J.P. Morgan's $1.2 billion financial interest in Sumitomo Corporation stock presents the strong appearance of partiality.

155.    The 14D-9 should disclose J.P. Morgan's specific pecuniary interest in the 6.354% Share Collar Transaction and set forth a reference table showing the net economic impact to J.P. Morgan if the price of Sumitomo stock increases or decreases.

## COUNT I

### Violations of Exchange Act §§ 14(d) – (e)
### And the Rules Promulgated Thereunder
### (Brought Individually Against Individual Defendants and Midas)

156.    Plaintiff incorporates and re-alleges each and every allegation set forth above as if fully set forth herein.

157.    Plaintiff brings this claim individually and not on behalf of the class.

158.    Section 14(e) prohibits the dissemination of materially false and misleading statements "in connection with a tender offer or request or invitation for tenders, or any solicitation of security holders in opposition to or in favor of any such offer, request, or invitation." 15 U.S.C. § 78n(e).

159.    Individually and in concert, the Individual Defendants and Midas have issued the 14D-9 with the intention of soliciting shareholder support for the Proposed Transaction that, in

41

violation of Section 14(e) of the Exchange Act, at the time and in the circumstances under which they were made, omitted to state material facts necessary in order to make the statements therein not false or misleading.

160.    By reason of the foregoing, the Individual Defendants and Midas have violated Section 14(e) of the Exchange Act.

161.    The misrepresentations and omissions in the 14D-9 are material to Plaintiff, and Plaintiff will be deprived of its right to make a fully informed decision of whether to tender its shares in support of the Proposed Transaction if such misrepresentations and omissions are not corrected prior to the vote on the Proposed Transaction.

## Count II

## (Brought Individually Against the Individual Defendants for Violation of § 20(a))

162.    Plaintiff incorporates and re-alleges each and every allegation set forth above as if fully set forth herein.

163.    The Individual Defendants were each controlling persons of the Company within the meaning of § 20(a) of the Exchange Act.  Specifically, each of the Individual Defendants had the power and authority to cause the Company to engage in the wrongful conduct complained of herein by reason of the fact that, as directors and/or officers of the Company, each participated in the day-to-day affairs of the Company in connection with the events leading to the Proposed Transaction and the subsequent filing of the 14D-9, in violation of Section 14(e) of the Exchange Act.

164.    As controlling persons of Midas, the Individual Defendants are jointly and severally liable to Plaintiff and the Class for the violations complained of herein.

## Count III

**Breach of Fiduciary Duties**
**Against the Individual Defendants**

165.    Plaintiff incorporates and re-alleges each and every allegation set forth above as if fully set forth herein.

166.    By the acts, transactions and courses of conduct alleged herein, the Individual Defendants have violated their fiduciary duties of good faith, loyalty, candor and due care at the expense of Plaintiff and other members of the Class.

167.    As alleged herein, the Individual Defendants have failed to, *inter alia*:

(a)    Adequately consider the Proposed Transaction, including whether it maximizes shareholder value;

(b)    Apprise themselves of the true value of the Company, or the benefits associated with pursuing the Proposed Transaction or an alternative transaction;

(c)    Engage in a full and fair sale process untainted by conflicts of interest;

(d)    Fulfill their fiduciary duty of candor by disseminating a 14D-9 in connection with the Proposed Transaction that does not contain false and misleading statements and/or omits to state information that is material to Midas' shareholders' decisions regarding the Proposed Transaction; and

(e)    Otherwise take the steps necessary to comply with their fiduciary duties.

168.    As such, unless the Individual Defendants' conduct is enjoined by the Court, they will continue to breach their fiduciary duties to Plaintiff and the other members of the Class, and will further a process that inhibits the maximization of shareholder value and the disclosure of material information.

169.    In light of the foregoing, the Individual Defendants must, as their fiduciary obligations require:

(a)     Undertake an appropriate evaluation of Midas' value;

(b)     Evaluate the Proposed Transaction and other potential transactions;

(c)     Enable public shareholders to consider the Proposed Transaction in a fair and non-coercive manner, without the threat of deal protection measures or mechanisms that could preclude or dissuade a value-maximizing transaction;

(d)     Refrain from favoring the Individual Defendants' interests over those of the Company's public shareholders, to, among other things, ensure that conflicts of interest do not unfairly influence the shareholders' decisions or available options;

(e)     Disclose all material facts necessary to permit the Company's public shareholders to make an informed decision with respect to the Proposed Transaction or any alternate transaction; and

(f)     Engage an independent and unconflicted financial advisor to opine on the fairness of the Proposed Transaction.

170.    Absent injunctive relief, Plaintiff and the Class will continue to suffer irreparable harm as result of the Individual Defendants' breaches of fiduciary duty, for which Plaintiff and the Class have no adequate remedy at law.

## COUNT IV

### Against Defendants TBC and Gearshift
### (For Aiding and Abetting the Individual Defendants' Breaches of Fiduciary Duties)

171.    Plaintiff incorporates and re-alleges each and every allegation set forth above as if fully set forth herein.

172.    Defendants by reason of their status as parties to the Proposed Transaction, and their possession of non-public information, have aided and abetted the Individual Defendants in the aforesaid breach of their fiduciary duties.

173.    Such breaches of fiduciary duties could not and would not have occurred but for the conduct of defendants Midas and TBC who, therefore, have aided and abetted such breaches in connection with the Proposed Transaction.

174.    As a result of the unlawful actions of defendants Midas and TBC, Plaintiff and the other members of the Class will be irreparably harmed in that they will not receive the true value for Midas' assets and business.  Unless the actions of Midas and TBC are enjoined by the Court, Defendants Midas and TBC will continue to aid and abet the Individual Defendants' breaches of their fiduciary duties owed to Plaintiff and the members of the Class.

175.    Plaintiff and other members of the Class have no adequate remedy at law.

## COUNT V

### Against Defendant J.P. Morgan
### (For Aiding and Abetting the Individual Defendants' Breaches of Fiduciary Duties)

176.    Plaintiff incorporates and re-alleges each and every allegation set forth above as if fully set forth herein.

177.    As alleged above, the Individual Defendants breached their fiduciary duties to Midas' shareholders.    Defendant J.P. Morgan is sued herein for aiding and abetting the Individual Defendants' breaches of fiduciary duty.

178.    Defendant J.P. Morgan knowingly guided its client, the Midas Special Committee of the Board to favor a sale to TBC, whose parent, Sumitomo, J.P. Morgan owns a substantial equity stake in and is involved in a share collar transaction with.

179.    As a result of the conduct by J.P. Morgan, Plaintiff and the Class have been and will be damaged by being denied the best opportunity to maximize the value of their investment in the Company.

180.    Plaintiff and the Class have no adequate remedy at law.

## PRAYER FOR RELIEF

**WHEREFORE,** Plaintiff demands relief in its favor and in favor of the Class and demands judgment against Defendants as follows:

A.     Declaring that this action is properly maintainable as a class action and certifying Plaintiff as the representative of the Class;

B.     Preliminarily and permanently enjoining Defendants and their counsel, agents, employees and all persons acting under, in concert with, or for them, from proceeding with, consummating, or closing the Proposed Transaction until such time, as any, that the Individual Defendants have fully complied with their fiduciary duties and adequately undertaken all appropriate and available methods to maximize shareholder value;

C.     Finding the Individual Defendants liable for breaching their fiduciary duties to the Class;

D.     Declaring that the Merger Agreement and Proposed Transaction was entered in breach of Defendants' fiduciary duties and is therefore unlawful and unenforceable;

E.     Finding the deal protection provisions in the Merger Agreement to be invalid and unenforceable, or in the alternative, amending those provisions as necessary to ensure a full and fair sale process for the benefit of the Class;

F.     Directing that the Company engage an independent and unconflicted financial advisor to opine on the fairness of the Proposed Transaction;

G.     Directing that the Company and Individual Defendants cure the material deficiencies in the 14D-9 by providing full and fair disclosure to shareholders;

H.     In the event that the Proposed Transaction is consummated, rescinding it and setting it aside, or awarding rescissory damages to the Class;

I.    Awarding compensatory damages against defendants, individually and severally, in an amount to be determined at trial, together with pre-judgment and post-judgment interest at the maximum rate allowable by law, arising from the proposed transaction;

J.    Directing that Defendants account to Plaintiff and the other members of the Class for all damages caused by them and account for all profits and any special benefits obtained as a result of their breaches of their fiduciary duties;

K.    Awarding Plaintiff the costs and disbursements of this action and a reasonable allowances for fees and expenses of Plaintiff's counsel and experts; and

L.    Granting Plaintiff and the Class such other and further relief as the Court may deem just and proper.

Dated: April 11, 2012

**POMERANTZ HAUDEK
GROSSMAN & GROSS LLP**

  /s/ Leigh Handelman

Patrick V. Dahlstrom
Leigh Handelman Smollar
Bar No. 6237247
Joshua B. Silverman
Ten South LaSalle Street, Suite 3505
Chicago, Illinois 60603
Tel: (312) 377-1181
Fax: (312) 377-1184

**POMERANTZ HAUDEK
GROSSMAN & GROSS LLP**

Marc I. Gross
Jeremy A. Lieberman
Gustavo F. Bruckner
100 Park Avenue
New York, New York 10017
Tel: (212) 661-1100
Fax: (212) 661-8665

**LAW OFFICE OF JACOB T. FOGEL, ESQ.**

Jacob T. Fogel, Esq.
26 Court Street
Brooklyn, New York 11242

*Liaison Counsel for Plaintiff Jacob M. Scheiner IRA*

Joseph H. Weiss
Richard A. Acocelli
Michael A. Rogovin
**WEISS & LURIE**
1500 Broadway, 16th Floor
New York, NY 10036

*Counsel for Plaintiff Jacob M. Scheiner IRA*