|  |  |  |
|---|---|---|
| Jacob M. Scheiner IRA,<br>individually and on behalf of all others<br>similarly situated, | )<br>)<br>) | No. 12 C 02653 |
|  | ) |  |
| Plaintiff, | ) |  |
|  | ) |  |
| v. | ) | Judge Edmond E. Chang |
|  | ) |  |
| Midas, Inc.; TBC Corporation; Gearshift | ) |  |
| Merger Corp.; J.P. Morgan Securities LLC; | ) |  |
| Alan D. Feldman; Robert R. Schoeberl; | ) |  |
| Thomas L. Bindley; Archie R. Dykes; | ) |  |
| Jarobin Gilbert, Jr.; and Diane L. Routson, | ) |  |
|  | ) |  |
| Defendants. | ) |  |

**MEMORANDUM OPINION AND ORDER**

Plaintiff Jacob M. Scheiner IRA (Scheiner, for short) brings this lawsuit against

Midas, Inc. and members of Midas's Board of Directors, including Alan Feldman,

Robert Schoeberl, Thomas Bindley, Archie Dykes, Jarobin Gilbert, Jr., and Diane

Routson (collectively, the Individual Defendants), alleging violations of §§ 14(d) and (e)

of the Securities Exchange Act of 1934 (Exchange Act), 15 U.S.C. §§ 78n(d)-(e), as well

as § 20(a) of the Exchange Act. 15 U.S.C. § 78t(a).[1] In addition, Scheiner brings a

putative class action suit against the Individual Defendants, TBC Corporation,

Gearshift Merger Corp., and J.P. Morgan Securities LLC seeking relief for the

Defendants' alleged breaches of fiduciary duty and other violations of Delaware state

law. All of Scheiner's claims stem from Midas and TBC's announcement in March 2012

---

[1]Jurisdiction is proper under 28 U.S.C. § 1331.

that the two companies had entered into a merger agreement, in which TBC would acquire Midas through a cash tender offer of $11.50 per share. The Defendants now move to dismiss Scheiner's complaint for failure to state a claim under Federal Rule of Civil Procedure 12(b)(6). For the reasons explained more fully below, Defendants' motions [R. 30, 36, 39] are granted.

## I. Background

In evaluating a motion to dismiss, the Court must accept as true the complaint's factual allegations and draw reasonable inferences in Scheiner's favor. *Ashcroft v. al-Kidd*, —— U.S. ——, 131 S. Ct. 2074, 2079 (2011). Plaintiff Jacob M. Scheiner IRA is an owner of Midas common stock. R. 1, Compl. ¶ 15. Midas is one of the world's largest providers of automotive services, with more than 2,000 franchised, licensed, and company-owned shops in 14 countries. *Id.* ¶ 16. In March 2012, upon unanimous approval by the Board of Directors, Midas entered into a Merger Agreement with TBC, one of the nation's largest marketers of automotive replacement tires. *Id.* ¶¶ 17, 45.

Scheiner alleges that Midas and the Midas Individual Defendants undertook an unfair and conflicted process designed to consummate a merger with TBC as quickly as possible despite the continued active interest from competing bidders. *Id.* ¶ 62. In April 2011, Midas requested that J.P. Morgan prepare a valuation analysis of the Company for the Board, so that the Board would be prepared to evaluate an offer to purchase the Company should the Company receive a proposal. *Id.* ¶ 63. J.P. Morgan's preliminary valuation was presented to the Board on May 10, 2011. *Id.* ¶ 64. Sometime in May 2011, Alan Feldman, who was Midas's Chairman and CEO, received unsolicited

calls from a private equity firm (Financial Buyer A) and Company A, both expressing interest in exploring the possibility of purchasing Midas. *Id.* ¶¶ 21, 65. Company A expressed interest in purchasing Midas for $10.00 per share in cash, while Financial Buyer A suggested purchasing Midas for $9.50 per share in cash. *Id.* Feldman did not advise the Board of Company A and Financial Buyer A's indications of interest until the August 8, 2011 Board meeting. *Id.* ¶ 66. In response to these indications of interest, however, the Board asked J.P. Morgan to complete additional valuation work. *Id.*

A few days later, Midas publicly announced that it would evaluate strategic alternatives with J.P. Morgan's assistance. *Id.* ¶ 67. On August 16, 2011, TBC's financial advisor, Morgan Joseph TriArtisan LLC, expressed TBC's interest in entering the process as a potential bidder for Midas. *Id.* ¶ 68. During the first week of November, eight parties expressed interest in purchasing Midas, with bids ranging between $8.50 to $14.00 per share in cash. *Id.* ¶ 71. An independent Special Committee was formed to evaluate the bids due to several conflicts of interest, including the long-term position held by Rob Schoeberl, Midas's lead director, on TBC's board of directors. *Id.* ¶ 72. It was also disclosed to the Board and Special Committee that J.P. Morgan held an ownership interest in Sumitomo, TBC's parent corporation.[2] Despite J.P. Morgan's financial interest in the deal, however, the Special Committee recommended that J.P. Morgan be formally retained as financial advisor. *Id.* On December 18, 2011,

---

[2]J.P. Morgan had a 7% ownership interest in Sumitomo Corporation, 6.354% of which represents a Share Collar Transaction. Compl. ¶¶ 92, 93. J.P. Morgan's interest in Sumitomo is worth approximately $1.2 billion. *Id.* ¶ 93.

Midas and the Special Committee executed an official engagement letter retaining J.P. Morgan as an advisor for the ongoing auction process. *Id.* ¶ 75.

In the interim, six bidders were chosen by the Special Committee to continue with the bidding process. *Id.* ¶ 73. In early January, a legal dispute arose between Midas and an Italian company, Mesa S.p.A, in which Mesa filed a complaint against Midas alleging a breach of the parties' strategic alliance and license agreements. *Id.* ¶¶ 74, 76. The Special Committee decided to request a second round of bid proposals from the bidders, in light of the pending Mesa dispute. *Id.* ¶ 77. Pursuant to this request, TBC raised its bid to a range of $12.25-$14.00 per share in cash from $12.00-$14.00 per share in cash, dependent on whether Midas was able to reach a settlement with Mesa. *Id.* ¶ 79. Company A increased its bid to $10.00 per share and expressed a willingness to pay 50% of the consideration in Company A stock. *Id.* ¶ 81. Four of the six bidders meanwhile dropped out of the sale process. *Id.* ¶ 80. On February 17, 2012, J.P. Morgan advised the Special Committee that TBC might lower its bid in light of the Mesa litigation, as well as a Canadian class action filed against Midas by Canadian Midas franchisees and Midas's underfunded pension. *Id.* ¶ 83. TBC later did lower its bid, from $12.25-$14.00 to $11.25 per share. *Id.* ¶ 85.

Despite Company A's increased bid and TBC's decreased bid, the Special Committee unanimously resolved to recommend that the Board approve the Merger Agreement with TBC on March 12, 2012. *Id.* ¶ 90. The Board approved the Agreement, and resolved to recommend that the shareholders accept the Tender Offer and tender their shares. *Id.* On March 13, 2012, Midas and TBC issued a joint press release

announcing the execution of the Merger Agreement. *Id.* ¶ 91. Under the Merger Agreement, TBC would acquire Midas through a cash tender offer of $11.50 per share for each outstanding share of Midas common stock owned. *Id.* ¶ 45. The Tender Offer would expire on April 24, 2012, and the Proposed Transaction would close in the second quarter of 2012, so long as a bare majority of shares were tendered, and the customary closing terms and conditions applied. *Id.* ¶ 46.

Scheiner alleges that Midas and the Midas Individual Defendants failed to disclose material information in its 14D-9 in violation of §§ 14(d), (e), and 20(a) of the Securities Exchange Act, and that these omissions prevented shareholders from making a fully informed decision as to whether to tender their shares. *Id.* ¶ 109. Specifically, Scheiner alleges that the 14D-9 failed to disclose when Feldman received the first indications of interest from Financial Buyer A and Company A, *id.* ¶ 112; why Feldman waited until August 2011 to inform the Board of Financial Buyer A and Company A's offers to purchase the Company, *id.* ¶ 113; how many other prospective bidders besides TBC contacted Midas during the auction period, *id.* ¶ 115; the criteria by which parties were chosen or considered during the auction process, *id.* ¶ 118; whether the Board was informed of J.P. Morgan's financial interest in Sumitomo after TBC entered the process in August 2011, *id.* ¶ 117; why Midas waited almost two months after the execution of the non-disclosure and standstill agreement with TBC to acknowledge Schoeberl's conflict of interest, *id.* ¶ 119; whether the Board or Special Committee considered getting a separate fairness opinion from an independent financial advisor after J.P. Morgan informed the Board and Special Committee of its

financial interest in Sumitomo, *id.* ¶ 132; and whether the Special Committee performed any conflict check to uncover J.P. Morgan's involvement with Sumitomo. *Id.* ¶ 133. Scheiner alleges that these omissions prevented Midas's public shareholders from making an informed decision with respect to the Proposed Transaction in violation of §§ 14(d), (e), and 20(a) of the Securities Exchange Act.

In addition to his individual federal securities law claims, Scheiner raises several class claims based on Delaware state law. Specifically, Scheiner alleges that the Individual Defendants breached their fiduciary duties of good faith, loyalty, candor, and due care by failing to adequately consider the Proposed Transaction, apprise themselves of the Company's true value, and engage in a full and fair sale process untainted by conflicts of interest. *Id.* ¶¶ 166, 167. Scheiner alleges that the Individual Defendants also breached their fiduciary duties by not seeking a separate fairness opinion from an independent and unconflicted financial advisor after the Board learned of J.P. Morgan's interest in Sumitomo. *Id.* ¶ 95. Moreover, Scheiner claims that the Individual Defendants had an incentive to approve the Proposed Transaction because they were offered to exchange their out-of-the-money stock options for replacement options at a lower exercise price. *Id.* ¶ 99. Under the option swap, the Midas executives had an incentive to lock down a merger deal as soon as possible to secure their change-in-control payday. *Id.* ¶ 101.

Finally, Scheiner alleges that J.P. Morgan, TBC, and Gearshift, a subsidiary of TBC, aided and abetted the Individual Defendants in breaching their fiduciary duties. *Id.* ¶¶ 172, 177, 178. With respect to the aiding and abetting claim against J.P.

Morgan, Scheiner alleges that J.P. Morgan's ownership interest in Sumitomo, coupled with its interest in the Share Collar Transaction, gave J.P. Morgan a financial incentive to steer the Board and Special Committee towards the TBC merger, regardless of the merits of other competing strategies or bids. *Id.* ¶ 94. Moreover, Scheiner alleges that J.P. Morgan had an incentive to recommend the approval of the merger because part of its fee was conditioned on the consummation of the Proposed Transaction. *Id.* ¶ 97. The complaint does not allege any specific facts supporting the aiding and abetting claim with respect to TBC and Gearshift.

## II. Standard of Review

Under Federal Rule of Civil Procedure 8(a)(2), a complaint generally need only include "a short and plain statement of the claim showing that the pleader is entitled to relief." Fed. R. Civ. P. 8(a)(2). This short and plain statement must "give the defendant fair notice of what the claim is and the grounds upon which it rests." *Bell Atl. v. Twombly*, 550 U.S. 544, 555 (2007) (quotation and citation omitted). The Seventh Circuit has explained that this rule "reflects a liberal notice pleading regime, which is intended to 'focus litigation on the merits of a claim' rather than on technicalities that might keep plaintiffs out of court." *Brooks v. Ross*, 578 F.3d 574, 580 (7th Cir. 2009) (quoting *Swierkiewicz v. Sorema N.A.*, 534 U.S. 506, 514 (2002)).

"A motion under Rule 12(b)(6) challenges the sufficiency of the complaint to state a claim upon which relief may be granted." *Hallinan v. Fraternal Order of Police Chicago Lodge No. 7*, 570 F.3d 811, 820 (7th Cir. 2009). "[W]hen ruling on a defendant's motion to dismiss, a judge must accept as true all of the factual allegations contained

in the complaint." *Erickson v. Pardus*, 551 U.S. 89, 94 (2007) (citing *Twombly*, 550 U.S. at 555-56); *McGowan v. Hulick*, 612 F.3d 636, 638 (7th Cir. 2010) (courts accept factual allegations as true and draw all reasonable inferences in plaintiff's favor). "[A] complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Twombly*, 550 U.S. at 570). These allegations "must be enough to raise a right to relief above the speculative level." *Twombly*, 550 U.S. at 555. The allegations that are entitled to the assumption of truth are those that are factual, rather than mere legal conclusions. *Iqbal*, 556 U.S. at 678-79.

### III. Analysis

The various defendants advance several theories in support of their motions to dismiss. First, Midas contends that Scheiner's § 14(e) claim must be dismissed as moot or, in the alternative, for failure to state a claim under Rule 12(b)(6). Second, Midas argues that because Scheiner's 14(e) claim fails, then his § 20(a) claim must also be dismissed. Finally, Defendants assert that in light of Scheiner's failure to state either a § 14(e) or § 20(a) claim, the Court should relinquish supplemental jurisdiction over the state-law breach of fiduciary duty claims. The Court addresses each of these arguments below.

## A. Section 14(e) claim

Midas asserts that Scheiner's § 14(e) claim is moot in light of the expiration of the tender offer period and the completion of the merger.[3] In the alternative, Midas contends that Scheiner's § 14(e) claim fails because the complaint does not support a claim for damages under § 14(e) claim, and because Scheiner has not satisfied the heightened pleading requirements of the Private Securities Litigation Reform Act of 1995 (PSLRA), 15 U.S.C. § 78u-4(b), and Federal Rule of Civil Procedure 9(b).

### 1. Mootness as to injunctive relief

Midas first argues that Scheiner's § 14(e) must be dismissed as moot because the tender offer period has expired and the merger is now complete. R. 53, Def.'s Reply Br. at 1-2. Midas further argues that because Scheiner did not seek preliminary injunctive relief to enjoin the Transaction before the expiration of the tender period, there are no 14D-9 disclosures left to remedy and Scheiner's § 14(e) claim is now moot. *Id.* at 2-3.

Section 14(e) of the Exchange Act makes it unlawful for any person to make "any untrue statement of a material fact or omit to state any material fact necessary in order to make the statements made . . . in connection with any tender offer or request or invitation for tenders, or any solicitation of security holders in opposition to or in favor of any such offer, request, or invitation." 15 U.S.C. § 78n(e). Here, Scheiner alleges that Midas failed to disclose material information in its 14D-9, which precluded

---

[3]In addition to the § 14(e) claim, Scheiner also alleges that the Defendants violated § 14(d) of the Exchange Act. However, because the Complaint makes only two bare references § 14(d), *see* Compl. at 1, 41, and Scheiner does not make a separate argument under § 14(d), the Court will analyze Scheiner's § 14 claims under § 14(e) only.

shareholders from making informed decisions as to whether they should tender their shares. But where, as here, the tender period has expired and the Plaintiff has failed to put the brakes on the tender by moving for a preliminary injunction and requiring corrections to the 14D-9, a § 14(e) claim for injunctive relief is moot. *See, e.g.*, *Hartmarx Corp. v. Abboud*, 326 F.3d 862, 871 (7th Cir. 2003). Accordingly, Scheiner's § 14(e) claim is moot as to injunctive relief.

## 2. Damages claim

Scheiner does not dispute that his § 14(e) claim would be moot if all he sought was injunctive relief. But Scheiner contends that he also seeks compensatory damages under § 14(e), and thus dismissal is not warranted. R. 50, Pl.'s Resp. Br. at 43, 44. Although it is true that the complaint does pray for damages in the event the Proposed Transaction is consummated, Compl. ¶ 10, Scheiner's complaint simply does not allege sufficient facts to support a § 14(e) claim for damages, as explained next.

To state a claim for damages under § 14(e), a plaintiff must allege that he or she relied on misstatements to his or her detriment. *See Neuman v. Elec. Specialty Co.*, 1969 WL 2828, at *4 (N.D. Ill. Dec. 31, 1969). Thus, courts have only allowed compensatory damages under § 14(e) where the plaintiff has relied on an alleged misstatement. *See, e.g.*, *Rondeau v. Mosinee Paper Corp.*, 422 U.S. 49, 59-60 (1975) (damages permissible where a pattern of nondisclosure has depressed the price of the target company's stock and the tender shareholder unwittingly thinks he got a bargain when he tenders his shares); *Petersen v. Federated Dev. Co.*, 387 F. Supp. 355, 359 (S.D.N.Y. 1974) (allowing damages where shareholders have been dissuaded from

tendering their shares at a substantial price due to false and misleading statements by the target company); *cf. Lowenschuss v. Kane*, 520 F.2d 255, 268-69 (2d Cir. 1975) (allowing damages where shareholders opted to tender their shares in an unsuccessful tender offer as a result of materially misleading disclosures, thereby forgoing the opportunity to accept a competitive tender offer or sell their stock elsewhere during the pendency of the tender offer).

In *Neuman*, the court grappled with the problem of allowing a private damage remedy in § 14(e) suits, and noted that "though injunctive relief [under § 14(e)] may be justified, a damage remedy is inappropriate when there can be no exact proof and measure of damages, and when the causal connection between the alleged wrong and plaintiff's loss is not determinable." *Neuman*, 1969 WL 2828, at *3. Indeed, "[i]f the private damage remedy were allowed without restriction, the shareholder who decided not to tender when the offer was outstanding, could, after the expiration of the offer, file a claim for damages which were a result of his own decision not to accept the offer rather than any misdeeds of the defendants." *Id.* The court reasoned, however, that the difficulties of proving damages are obviated when, "as a condition of any recovery under the private damage remedy, the shareholder must prove that his *reliance on any alleged misrepresentations was the cause of his refusal to tender.*" *Id.* at *4 (emphasis added). Thus, a shareholder (like Scheiner) who does not tender his shares during the tender offer period but later seeks damages under § 14(e) must show that he relied on the alleged misrepresentation in not tendering.

Here, Scheiner filed the present lawsuit before the deadline to tender his shares had passed, and before he could have relied on the alleged omissions in Midas's 14D-9. A plaintiff who is aware of a purported omission prior to a tender offer does not have a claim "under . . . [a] securities law requiring proof of reliance, because [he] w[as] never deceived." *Stark Trading v. Falconbridge Ltd.*, 552 F.3d 568, 573 (7th Cir. 2009). Accordingly, to the extent that Scheiner seeks damages under § 14(e), the Complaint fails to state a claim on which relief can be granted because Scheiner does not claim to have relied on Midas's alleged misrepresentations.

### 3. Scienter

Even assuming that Scheiner had adequately pled reliance, his § 14(e) claim would still fall short of the heightened pleading requirements of Rule 9(b) and the PSLRA because he fails to plead that the Defendants acted with "scienter," a term of art for the culpable state-of-mind required to prove a § 14(e) claim. *In re Digital Island Sec. Litig.*, 357 F.3d 322, 328 (3d Cir. 2004) ("[S]cienter is an element of a Section 14(e) claim."); *Conn. Nat'l Bank v. Fluor Corp.*, 808 F.2d 957, 961 (2d Cir. 1987). Thus, in order to state a valid claim under § 14(e), Scheiner must plead that the Defendants acted with "intent to deceive, manipulate or defraud" or "reckless disregard of a substantial risk" that a representation at issue is false. *Ernst & Ernst v. Hochfelder*, 425 U.S. 185, 193 (1976); *Higginbotham v. Baxter Int'l Inc.*, 495 F. 3d 753, 756 (7th Cir. 2007).

Scheiner seems to disclaim a state-of-mind requirement altogether, that is, he seems to argue that scienter is not necessary to state a § 14(e) claim. Pl.'s Resp. Br. at

13-15. This is simply incorrect, for the reasons discussed in the cases cited above. But setting that aside and reading the complaint in the light most favorable to Scheiner, the complaint still fails to sufficiently allege that the Defendants acted with the requisite state of mind to support a valid § 14(e) claim and falls short of the heightened pleading requirements of Rule 9(b) and the PSLRA.

Although a complaint is ordinarily sufficient if it contains a "short and plain statement of the claim showing that the pleader is entitled to relief," Fed. R. Civ. P. 8(a)(2), a plaintiff alleging fraud must plead with particularity the circumstances constituting fraud. *Blanchard v. EdgeMark Fin. Corp.*, 1999 WL 59994, at *14 (N.D. Ill. Feb. 3, 1999). Contrary to Scheiner's assertions that his § 14(e) claim does not sound in fraud and thus is not subject to Rule 9(b)'s pleading standard, courts in this district have consistently applied Rule 9(b) to § 14(e) claims. *See, e.g.*, *id.* ("Plaintiffs' Section 14(e) claim . . . must also satisfy the particularity requirement of Rule 9(b) because Section 14(e) and Rule 10b-5 are coextensive in their antifraud prohibitions.") (internal quotation marks omitted); *see generally Coronet Ins. Co. v. Seyfarth*, 665 F. Supp. 661, 665-66 (N.D. Ill. 1987). Under Rule 9(b), a plaintiff alleging fraud must identify the person who made the misrepresentation; the time, place, and content of the misrepresentation; and the method by which the misrepresentation was made. *Vitcom, Inc. v. Harbridge Merch. Servs., Inc.*, 20 F.3d 771, 777 (7th Cir. 1994); *see also Borsellino v. Goldman Sachs Grp., Inc.*, 477 F.3d 502, 507 (7th Cir. 2007) (fraud must be pled with particularity by providing the who, what, when, where, and how).

The PSLRA further raises the pleading standard for securities fraud claims. *See*

*Makor Issues & Rights, Ltd. v. Tellabs, Inc.*, 437 F.3d 588, 596 (7th Cir. 2006) ("[T]he

PSLRA essentially returns the class of cases it covers to a very specific version of fact

pleading—one that exceeds even the particularity requirement of Federal Rule of Civil

Procedure 9(b)."). In charging misrepresentations or omissions of material fact, the

PSLRA requires that the complaint "specify each statement alleged to have been

misleading, the reason or reasons why the statement is misleading, and, if an

allegation regarding the statement or omission is made on information or belief, the

complaint shall state with particularity all facts on which that belief is formed." 15

U.S.C. § 78u-4(b)(1).

In trying to adequately allege scienter under the PSLRA, the "complaint shall,

with respect to each act or omission alleged to violate this chapter, state with

particularity facts giving rise to a strong inference that the defendant acted with the

required state of mind." 15 U.S.C. § 78u-4(b)(2)(A). A complaint will survive a motion

to dismiss only if a reasonable person would deem the inference of scienter cogent and

at least as compelling as an opposing inference that could be drawn from the facts

alleged. *Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308, 324 (2007). The

Supreme Court has emphasized that "[t]he inquiry . . . is whether *all* of the facts

alleged, taken collectively, give rise to a strong inference of scienter, not whether any

individual allegation, scrutinized in isolation, meets that standard." *Id.* at 322-23

(emphasis in original). As the Court explained, "[t]he strength of an inference cannot

be decided in a vacuum. The inquiry is inherently comparative: How likely is it that

one conclusion, as compared to others, follows from the underlying facts?" *Id.* at 323.

Although the inference of scienter must be more than merely "reasonable," it need not

be irrefutable, or even the "most plausible of competing inferences." *Id.* at 324 (internal

quotation marks omitted). It must, however, be "cogent and compelling." *Id.*

A strong inference of fraud may be established either by alleging facts to show

that the defendants had both motive and opportunity to commit fraud, or by alleging

facts that constitute strong circumstantial evidence of misbehavior or recklessness.

*Rehm v. Eagle Fin. Corp.*, 954 F. Supp. 1246, 1253 (N.D. Ill. 1997) (citing *Shields v.

Citytrust Bancorp., Inc.*, 25 F.3d 1124, 1128 (2d Cir. 1994)). Motive would entail

concrete benefits that could be realized by one or more of the false statements and

wrongful nondisclosures alleged, while opportunity would entail the means and likely

prospect of achieving concrete benefits by the means alleged. *Id.* at 1253 (internal

citations omitted).

Here, Scheiner alleges that several members of Midas's Board of Directors

violated § 14(e). Where a securities fraud claim is brought against multiple defendants,

a plaintiff must plead facts creating a strong inference of scienter with respect to *each*

defendant, rather than lump them together with accusations directed broadly at a

group. *Pugh v. Tribune Co.*, 521 F.3d 686, 693 (7th Cir. 2008) (rejecting the "group

pleading doctrine"). Scheiner fails to meet this heavy pleading burden, as the

Complaint does not set forth individual allegations of scienter as to each of the

Individual Defendants. The only Individual Defendants that are mentioned by name

are Feldman and Schoeberl, but even these allegations fail to give rise to a "cogent and compelling" inference of scienter. *Tellabs*, 551 U.S. at 324.

Scheiner alleges that Feldman received approximately 151,000 replacement options in the option swap, and that under the Merger Agreement, all of Feldman's unvested options would vest and become exercisable, entitling him to over $3.8 million. Compl. ¶ 100. Scheiner argues that the option swap gave Feldman and the other Midas executives an incentive to initiate a sham auction process and tilt the subsequent process in favor of TBC as a way to secure their change-in-control payday. *Id.* ¶ 101. These allegations are insufficient to rise to the level of cogent and compelling, because generalized allegations of financial motive standing alone cannot support a claim that directors were engaged in culpable conduct. *See In re Indep. Energy Holdings PLC Sec. Litig.*, 154 F. Supp.2d 741, 771 n.23 (S.D.N.Y. 2001); *see also Rehm*, 954 F. Supp. at 1254 ("In looking for a sufficient allegation of motive, we assume that the defendants are acting in their informed economic self interest.") (internal citations and quotations omitted).

The complaint also alleges that Feldman waited over two months to inform the Board of Financial Buyer A and Company A's offers to purchase the company. Compl. ¶ 113. Under the *Tellabs* standard, an inference of scienter must be cogent and at least as compelling as an opposing inference that could be drawn from the facts alleged. *Tellabs*, 551 U.S. at 324. Here, three reasons militate against an inference of fraud and in favor of a more compelling, opposing inference: First, Feldman did eventually inform the Board of Financial Buyer A and Company A's offers in August 2011. Compl. ¶ 66.

Second, in response to the information, the Board requested that J.P. Morgan complete additional valuation work, *id.*, which suggests that the Company was considering other offers seriously. Finally, Company A was among the six bidders eventually chosen by the Special Committee to continue with the bidding process. *Id.* ¶ 73. The inference that Scheiner would like the Court to draw—that Feldman waited for over two months to inform the Board of Company A's and Financial Buyer A's indications of interest in order to prevent the Board from considering other offers—is neither cogent nor compelling in light of these facts. Moreover, the Court has been unable to identify any Delaware case law indicating that a CEO has a duty to disclose all offers and indications of interest in acquiring the company to the Board, which would be relevant in evaluating whether an inference of fraud can be drawn from a delay in disclosure.[4] Accordingly, Scheiner has failed to plead scienter with sufficient particularity, and his § 14(e) claim is dismissed as to Defendant Feldman.

Scheiner's allegations against Schoeberl fare no better. The complaint alleges that the Company waited until November—over seven weeks after the nondisclosure and standstill agreement had been executed with TBC—to acknowledge Schoeberl's conflict of interest. Compl. ¶ 119. Scheiner would have the Court infer that Schoeberl intended to defraud the shareholders of a more profitable merger deal by waiting to disclose his conflict of interest with TBC to the Board. But, as with Feldman, we

---

[4]Note, however, that under Delaware law, a *board of directors* is under no duty to disclose casual inquiries regarding the sale of the corporation to *shareholders*. *Bershad v. Curtis-Wright Corp.*, 535 A.2d 840, 846-47 (Del. 1987).

cannot infer scienter from a mere delay, especially when the facts are undisputed that the information was eventually disclosed and the Board took proper steps in response to the information. In Schoeberl's case, the Board subsequently formed a Special Committee of independent directors to evaluate bids and other strategic alternatives. *Id.* ¶ 72. That Schoeberl was screened off of the evaluation process, and that six other bidders were permitted to continue with the bidding process after the Special Committee was formed, *id.* ¶ 73, suggest that Schoeberl did not act with the requisite scienter to prevent a fair bidding process. Thus, Scheiner fails to plead that Schoeberl acted with the requisite state of mind to state a valid § 14(e) claim.

Because the complaint inadequately sets forth facts that give rise to a cogent and compelling inference of scienter with respect to Feldman and Schoeberl, and worse, contains no particularized allegations of fraud as to the remaining Individual Defendants, Scheiner's § 14(e) claim against Midas and the Individual Defendant must be dismissed.

## B. Section 20(a) claim

Scheiner also alleges that the Midas Individual Defendants violated § 20(a) of the Exchange Act, which imposes control person liability for violations of the Exchange Act. Specifically, § 20(a) provides that "[e]very person who, directly or indirectly, controls any person liable under any provision of this chapter or of any rule or regulation thereunder shall also be liable jointly and severally with and to the same extent as such controlled person." 15 U.S.C. § 78t(a). But in order "to state a claim under § 20(a), a plaintiff must first adequately plead a primary violation of securities

18

laws . . . ." *Pugh*, 521 F.3d at 693. In light of Scheiner's failure to state a primary violation under § 14(e), Scheiner's § 20(a) claim is also dismissed.

## C. State claims

With the dismissal of the federal claims, the only remaining claims in Scheiner's complaints are those governed by Delaware state law. These state-law claims allege that the Individual Defendants breached their fiduciary duties to the shareholders, and that TBC, Gearshift, and J.P. Morgan aided and abetted in their breach. Compl. ¶¶ 165-180. Defendants argue that if the Court dismisses Scheiner's federal claims under § 14(e) and § 20(a), it should relinquish supplemental jurisdiction over Scheiner's state law claims under 28 U.S.C. § 1367(c).

This Court has subject-matter jurisdiction over Scheiner's state law claims under 28 U.S.C. § 1367, which provides that

> in any civil action of which the district courts have original jurisdiction, the district courts shall have supplemental jurisdiction over all other claims that are so related to claims in the action within such original jurisdiction that they form part of the same case or controversy under Article III of the United States Constitution.

28 U.S.C. § 1367(a). Section 1367(a) codifies the pendent jurisdiction doctrine, or the principle that "the federal courts' original jurisdiction over federal questions carries with it jurisdiction over state law claims that 'derive from a common nucleus of operative fact,' such that the 'relationship between [the federal] claim and the state claim permits the conclusion that the entire action before the court comprises but one constitutional 'case.'" *City of Chicago v. Int'l Coll. of Surgeons*, 522 U.S. 156,

164-65 (1997) (alteration in original) (quoting *United Mine Workers of Am. v. Gibbs*, 383 U.S. 715, 725 (1966)).

Pendent jurisdiction is a doctrine of discretion, and district courts can decline to exercise jurisdiction when it would undermine the principles of judicial economy, convenience, fairness, and comity which underlie the pendent jurisdiction doctrine. *Cf. City of Chicago*, 522 U.S. at 158. Section 1367(c) outlines several situations in which a court may decline to exercise supplemental jurisdiction, including when the district court has dismissed all claims over which it has original jurisdiction. 28 U.S.C. § 1367(c)(3). As the Supreme Court has recognized, "in the usual case in which all federal-law claims are eliminated before trial, the balance of factors to be considered under the pendent jurisdiction doctrine—judicial economy, convenience, fairness, and comity—will point toward declining to exercise jurisdiction over the remaining state law claims." *Carnegie-Mellon Univ. v. Cohill*, 484 U.S. 343, 350 n.7 (1988). But this does not mean that a district court *must* relinquish supplemental jurisdiction whenever all federal claims have been dismissed. Indeed, the Seventh Circuit has identified three situations in which jurisdiction over supplemental claims should be retained even though the federal claims have dropped out: where the statute of limitations would bar the refiling of the supplemental claims in state court; where substantial federal judicial resources have already been expended on the resolution of the supplemental claims; and where it is obvious how the claims should be decided. *Wright v. Associated Ins. Cos.*, 29 F.3d 1244, 1251-52 (7th Cir.

1994); *see also Miller Aviation v. Milwaukee Cnty. Bd. of Supervisors*, 273 F.3d 722, 731-32 (7th Cir. 2001); *Timm v. Mead Corp.*, 32 F.3d 273, 277 (7th Cir. 1994).

The situation envisioned by § 1367(c)(3) is precisely the scenario we have here. The Court has dismissed all of Scheiner's federal claims, leaving only his state law claims, and none of the factors of judicial economy, convenience, fairness, and comity militate in favor of retaining jurisdiction over the state-law claims. The parties have yet to conduct any discovery on the state-law claims, so there is no risk that dismissing the state-law claims now would result in duplicative litigation efforts.[5] Moreover, none of the situations outlined in *Wright* applies here: there is no statute of limitations bar to Scheiner refiling his claims in state court; there has been no expenditure of federal judicial resources on the state-law claims because no discovery has been conducted; and it is not obvious how the state law claims should be decided. *Wright*, 29 F.3d at 1251-52. Accordingly, under § 1367(c)(3), the Court relinquishes supplemental jurisdiction over Scheiner's breach of fiduciary and aiding and abetting claims.

---

[5]It bears noting that other Midas shareholders brought a parallel class action suit against the Defendants in Delaware Chancery Court alleging the same state law violations. In November 2012, however, plaintiffs voluntarily dismissed their claims against the Defendants, and as of the date of this opinion, that proceeding has been terminated. *See Freedman v. Midas, Inc., et al.*, C.A. 7346-VCP (Del. Ch. Nov. 9, 2012). As such, it makes little sense for the Court to retain jurisdiction over claims that, at the parties' stipulation, are no longer in dispute in a parallel proceeding.

## IV. Conclusion

For the reasons stated above, Defendants' motions to dismiss [R. 30, 36, 39] are granted.

ENTERED:

_____
Honorable Edmond E. Chang
United States District Judge

DATE: January 29, 2013